Glenn H. BINGER et al., Respondents and Cross-Appellants,

v.

CITY OF INDEPENDENCE, Missouri, Appellant and Cross-Appellee

No. 60762.

Supreme Court of Missouri, En Banc.

Sept. 11, 1979.

Rehearing Denied Oct. 19, 1979.

Robert H. Freilich, University of Mo., School of Administration, Kansas City, James S. Cottingham, Thomas D. Cochran, Richard G. Carlisle, Independence, for appellant and cross-appellee.

W. Raleigh Gough, Rufus B. Burrus, Independence, for respondents and cross-appellants.

JAMES A. FINCH, Jr., Senior Judge.

This is an appeal in a declaratory judgment suit wherein plaintiffs, as representatives of a class of objecting property owners, sought a declaration that annexations by the City of Independence of five contiguous areas in which plaintiffs reside were unreasonable and therefore void. The trial court held that plaintiffs were entitled to maintain the class action, that all of the annexations were unreasonable and voidable and that they should be set aside as requested by plaintiffs. On appeal the Missouri Court of Appeals, Western District, reversed, holding that the annexations were valid. However, on application of plaintiffs, it ordered the case transferred to this court "because of the general interest and importance of this case in that the opinion herein of this court may extend or broaden the present scope of review and quantum of proof necessary in annexation cases." We now decide the case as though here on direct appeal. Mo.Const., Art. V, § 10. We reverse.

Independence is a constitutional charter city. Such cities annex territory by amending their city charters to incorporate into the city the area to be annexed. *City of Hannibal v. Winchester*, 391 S.W.2d 279 (Mo. banc 1965).

In 1958, Independence adopted a "holding ordinance" to indicate that it was contemplating annexation of a large area to the east and northeast. The city annexed 13.4 square miles thereof in 1960 and 16 square miles in 1963, plus two very small tracts in 1961 and 1962. These extended the eastern boundary of Independence to the Little Blue River and increased the area of the city to 47.8 square miles.

In 1968 the city completed and published a comprehensive plan for future development which included planning for areas proposed for annexation. Some revisions were made subsequently and in the spring of 1972 the city adopted ordinances which provided for amending the city charter to annex five territories containing 29.7 square miles of land. These territories were a part of the area designated in the "holding ordinance" of 1958 and included in the comprehensive plan.

The ordinances called for a vote thereon by the voters of Independence in a special election to be held on December 5, 1972. In that election the vote favored annexation of all five territories. Territory No. 3 was to be annexed effective December 31, 1973, Territories 1 and 2 effective December 31, 1974, and Territories 4 and 5 effective December 31, 1975.

Thereafter, the procedures whereby annexation was accomplished were attacked in a proceeding in the nature of quo warranto which sought to oust Independence from exercising jurisdiction over the five territories annexed. The trial court ordered ouster but on appeal this court reversed, holding (1) that annexation by charter amendment was the proper and exclusive method of annexation by a constitutional charter city, (2) that proposals to approve such charter amendments could be voted on at a special election and (3) that simultaneous elections in the territories to · be annexed, required by § 71.870,[1] were not necessary because on December 5, 1972, the date of the special election, Jackson County had not yet become a first class chartered county. *State at inf. of Martin v. City of Independence*, 518 S.W.2d 63 (Mo.1974).[2] Thereupon plaintiffs filed this action attacking the reasonableness of and necessity for the annexations.

Prior to 1953 the courts of Missouri reviewed the validity of annexation proceedings only after they were consummated. This occurred when and if suits attacking such annexations were filed. Usually this was by suits in equity to enjoin enforcement. Sometimes it was by quo warranto and at least once it was by a suit for declaratory judgment. As this court said in *City of St. Joseph v. Hankinson*, 312 S.W.2d 4, 8 (Mo.1958), "In so doing, it has been the universal rule that the court does not, in any sense, substitute its discretion or judgment as to the advisability or propriety of the annexation for that of the legislative body of the city, and that it does not review the legislative discretion; its consideration of 'reasonableness' is confined to a determination of whether there exists a sufficient showing of reasonableness to make that question, at the least, a fairly debatable one; if there is such, then the discretion of the legislative body is conclusive. *State ex inf. Taylor ex rel. Kansas City v. North Kansas City*, Banc, 360 Mo. 374, 228 S.W.2d 762; *Faris v. City of Caruthersville*, Mo. App., 301 S.W.2d 63; *State ex inf. Mallet ex rel. Womack v. City of Joplin*, 332 Mo. 1193, 62 S.W.2d 393; *Dressel v. City of Crestwood*, Mo.App., 257 S.W.2d 236. The function of our courts, historically, has been merely to determine, in the light of these principles, whether the exercise of the legislative powers has been arbitrary and clearly unreasonable. (See the cases just cited.) Only to this extent do our courts consider the reasonableness of an annexation."

In 1953 legislation known as the Sawyers Act was enacted. Laws 1953, p. 309, § 1. It now is identified as § 71.015. It provides:

"Whenever the governing body of any city has adopted a resolution to annex any unincorporated area of land, such city shall, before proceeding as otherwise authorized by law or charter for annexa-

1. All statutory references are to RSMo 1969 unless otherwise indicated.

2. The court recognized that § 71.870 is valid and that it requires that charter cities in first class chartered counties hold simultaneous separate elections in the annexing city and in the area to be annexed. It did not apply to the December 5, 1972, elections by the City of Independence because Jackson County would not become a first class chartered county until January 1, 1973.

tion of unincorporated areas, file an action in the circuit court of the county in which such unincorporated area is situated, under the provisions of chapter 527 RSMo, praying for a declaratory judgment authorizing such annexation. The petition in such action shall state facts showing:

1. The area to be annexed;

2. That such annexation is reasonable and necessary to the proper development of said city; and

3. The ability of said city to furnish normal municipal services of said city to said unincorporated area within a reasonable time after said annexation is to become effective. Such action shall be a class action against the inhabitants of such unincorporated area under the provisions of section 507.070, RSMo."

This section was construed in *City of St. Joseph v. Hankinson, supra,* at p. 9 as follows:

"We construe § 71.015 as merely giving to the courts, in advance of a consummated annexation, the same judicial power and authority to test the reasonableness and necessity for an annexation which they have always exercised after its completion; that is to say, to decide whether the legislative declaration by the city is so palpably unreasonable and unnecessary as to be an arbitrary and oppressive exercise of its legislative power."

In *McConnell v. City of Kansas City,* 282 S.W.2d 518 (Mo.1955), plaintiff attacked an annexation by Kansas City on the basis that it had not obtained the declaratory judgment mandated by § 71.015. The court held that the Sawyers Act, insofar as it sought to impose the procedure therein specified on a constitutional charter city as a condition precedent to proceeding with annexation, was unconstitutional. This ruling was reaffirmed in *Hannibal v. Winchester,* 391 S.W.2d 279 (Mo. banc 1965) and in *St. Louis County v. City of Florissant,* 406 S.W.2d 281 (Mo. banc 1966). Plaintiffs do not now contend otherwise but they do assert that the Sawyers Act, in addition to prescribing a procedure to follow in the annexation process, had the effect of impliedly repealing the previously existing discretion of city legislative bodies to resolve the reasonableness of and necessity for annexation and that this portion of the Act is applicable to constitutional charter cities. They further contend that since cities which are required by the Sawyers Act to file a suit to determine reasonableness and necessity have the burden of proof to establish that annexation is reasonable and necessary, a similar burden must be placed on constitutional charter cities, even though the action attacking reasonableness is filed by property owners, because to hold otherwise would result in a denial of equal protection as between constitutional charter and other cities.

We reject both of these contentions. With reference to the argument that the Sawyers Act had the effect of limiting the legislative discretion of all cities in the annexation process, it is true that this court in *McDonnell Aircraft Corp. v. City of Berkeley,* 367 S.W.2d 498 (Mo.1963) held that even though constitutional charter cities are not required to follow the *procedure* specified in § 71.015, said section does set *standards for all cities* in that it requires that such annexation must be reasonable and necessary. However, that does not mean that enactment of § 71.015 had the effect of changing the nature of judicial review of such proceedings from what it had been theretofore. In fact, the decisions of this court hold to the contrary. As previously noted, the court in *City of St. Joseph v. Hankinson, supra,* held that the Sawyers Act merely provided for the courts in advance of the completion of annexation, to exercise "the same judicial power and authority to test the reasonableness and necessity for an annexation which they have always exercised after its completion;" 312 S.W.2d at 9. Case law already required that annexation be reasonable and necessary.

This conclusion that a change in the nature of judicial review of annexation was not produced by enactment of the Sawyers Act necessarily follows from what the court

said later in *City of Olivette v. Graeler,* 369 S.W.2d 85, 96 (Mo.1963):

"In our view plaintiff has not met its burden of proving the elements required by the Sawyers Act. In so ruling we do not usurp the legislative function, but merely hold that there was no substantial evidence to show that the proposed annexation was reasonable. The so-called 'debatable' rule merely means that if there is substantial evidence both ways, then the legislative conclusion is determinative."

In *Graeler* the court applied the rule, articulated in *Hankinson,* that the court will defer to the legislative determination of reasonableness and necessity if the evidence shows the question was "fairly debatable." The court concluded that the evidence in that case did not so show and therefore held the annexation invalid.

In the later case of *Young v. Mayor, Council and Citizens of the City of Liberty,* 531 S.W.2d 732, 737 (Mo. banc 1976), the court again clearly stated that the test of reasonableness and necessity under § 71.015 was the same question resolved in cases before the Sawyers Act, saying:

"The purpose and effect of this statute has been stated in the numerous cases which have arisen since its passage. It does require a favorable judgment as a condition precedent to a municipal annexation. The essential consideration for the court is the reasonableness of the proposed action, the same judicial question which was involved in annexation cases prior to the Sawyers Act, except that in those cases, the question arose subsequent to the annexation, not before. * * * Annexation by a municipality remains a legislative prerogative. The Sawyers Act affects merely the procedure by which the limited authority of the judiciary in the process is invoked. *City of St. Joseph v. Hankinson, supra.*"

Thus the effect of the Sawyers Act was procedural rather than substantive. Whereas the practice had been for annexation to be completed after which reasonableness and necessity were judicially re-viewed if a suit calling for such review was instituted, the Sawyers Act required such review during the process of annexation and before its completion. This had the obvious advantage of resolving such questions as a condition to proceeding with annexation instead of necessitating that annexation be undone where shown thereafter to be unreasonable. It did not change the substantive requirements.

Plaintiffs' second contention is that in order to avoid a denial of equal protection the burden of proof in this action must be on Independence just as it is on cities bringing Sawyers Act cases. This argument is predicated on the assumption that in suits to determine the reasonableness and necessity of legislative action to annex, the burden of proof, referred to in § 71.015 and in previous annexation cases, has reference to a burden of persuasion that the preponderance of the evidence establishes reasonableness and necessity or the absence thereof. Actually, that is not what the term burden of proof means in these cases. This necessarily is true because the outcome of these cases does not depend on whether a city establishes by a preponderance of the evidence that annexation is reasonable and necessary or that citizens establish by a preponderance of the evidence that such annexance is unreasonable and unnecessary. There is not in these cases a burden of persuasion by a preponderance of evidence. Instead, the test is whether the evidence shows that the question of reasonableness and necessity of the annexation was fairly debatable. If it does, the legislative decision must stand. Therefore, when the suits to test reasonableness and necessity (both the Sawyers Act and the pre-Sawyers Act cases) speak of the burden of proof, they necessarily refer to a burden of proceeding with the evidence. The earlier cases have not analyzed the term burden of proof and have not articulated the fact that it really means the burden of proceeding with the evidence, but, as pointed out above, this necessarily is so and it henceforth should be so interpreted.

The ultimate test, regardless of which party brings the suit and has the burden of proceeding with the evidence, is whether the reasonableness and necessity of proposed annexation was fairly debatable. Under such circumstances there is no denial of equal protection in requiring citizens to institute suit attacking annexation by Constitutional charter cities and to proceed with the evidence therein. This issue is resolved against plaintiffs.

Plaintiffs next assert that in deciding this appeal our review is governed by *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976) and that under said decision we must affirm the decision of the trial court. We disagree. *Murphy v. Carron* governs appeals in court tried cases wherein the trial court has acted as the trier of fact. It does not apply when the trial court has reviewed the propriety of a decision by an administrative or by a legislative body. In the latter instance we examine the record to determine whether there is substantial evidence to support the legislative decision. If we determine therefrom as a matter of law that there is no substantial evidence to show that the annexation was reasonable and necessary, as the court did in *City of Olivette v. Graeler, supra,* then the annexation must be set aside. However, if the court concludes from the record that there is substantial evidence that the annexation was reasonable and necessary, then the issue was at least debatable and the legislative decision must be permitted to stand.

We conclude and hold that there is substantial evidence that the decision of the Independence City Council to annex was reasonable and necessary. While there also was much evidence to the contrary, the issue was fairly debatable which means that we must sustain the legislative decision made by the City of Independence.

This was a lengthy trial. Both sides called many witnesses and introduced a large number of exhibits. There are more than 1300 pages of testimony. It would serve no useful purpose to detail all of that evidence. It will suffice to refer briefly to some of the evidence which supports the decision made by the city council and makes the issues of reasonableness and necessity reasonably debatable.

In 1940 the population of Independence was 16,066. Between that date and 1970 the city grew dramatically. In 1950 the population was 36,963, in 1960 it was 62,328 and in 1970 it was 111,662. There was evidence which indicated substantial future growth in population. The 1968 Comprehensive Plan for the City of Independence, introduced by plaintiffs as their Exhibit 17, disclosed that a 1966 study by Midwest Research Institute projected a population of 220,000 for Independence by 1990. Winford Winholtz, a city planning consultant called as a witness by plaintiffs, expected comparable growth. There also was evidence of some residential development in the area annexed prior to the vote thereon. Mayor King, and others, told of present and planned development of various areas. The council may consider the future as well as present needs of the city. *City of St. Joseph v. Hankinson, supra,* 312 S.W.2d at 18.

There also was testimony of substantial commercial development. For example, Mayor King testified that there had been more such development in Independence during the preceding five years than there had been in the entire twenty-five years before that. One such project was the Independence Center which was described as the second largest shopping center of its type in the nation. That center, located in Independence was only a mile from some of the territory annexed as a result of the election in December, 1972. There was evidence of other planned commercial development in that area.

Mayor King testified concerning the development of warehousing, some in the city as it existed before the 1972 annexation vote and some planned in annexed territory. Reference was made to a 400,000 square foot warehouse occupied by Hunt, Wesson Foods. A considerable warehousing development was being established in caves created by earlier underground mining of lime-

stone. Those areas were being prepared and utilized for extensive warehousing.

There also was testimony of industrial development and of efforts to attract more industry. The Geospace Industrial Park was established for that purpose. Other developments of great significance in connection with industrial development, as well as growth generally, consisted of the formation of the Little Blue Sewer District and the establishment of a plan to control flooding in the Little Blue River Valley, joint projects of the federal government and Jackson County, with some local government participation.

Little Blue Sewer District was created for the purpose of constructing a large common interceptor sewer which would serve the entire area from Cass County north through the Little Blue Valley, including eleven municipalities in eastern and southern Jackson County. It was designed to collect sewage from sewer systems of the various municipalities and carry it to a treatment plant to be constructed in the Atherton Bottoms near the point where the Little Blue River empties into the Missouri River. The project was designed to enable cities to have adequate sewer systems and to eliminate the dumping of insufficiently treated sewage into the river, thereby producing compliance with state and federal clean water and anti-pollution statutes. Construction of the sewer was commenced in Independence because that was where the need for service was greatest and because it was necessary, in order to sell revenue bonds for the project, to enlist Independence which had the best municipal bond rating. At the time of trial that portion of the interceptor sewer had been constructed and Independence and Blue Springs were utilizing it. For this Independence was paying more than $30,000 per month in fees. A temporary treatment plant to handle this sewage had been constructed pending completion of the interceptor sewer and construction of the treatment plant in the Atherton Bottoms. Completion of the system is scheduled for 1982.

The river control project called for straightening and widening of the channel of the Little Blue River and for the construction of two lakes to impound flood waters. The project was designed to eliminate all except so-called 100 year floods, thereby making land in the flood plains usable, particularly for industrial development. As a part of this project there is to be an industrial expressway (Little Blue Valley Expressway) following generally the course of the river, and Jackson County will acquire lands adjacent to the river which will be utilized as a county park to be known as the Little Blue Trace Parkway. The federal government is to pay most of the cost of this project but local government is expected to bear certain expenses. For example, Independence will pay bridge costs over the relocated river channel at Truman Road and at R. D. Mize Road.

Testimony indicated that much of the land in the flood plain of the Little Blue has not been usable because of the threat of flooding and because of lack of sewage facilities but that it could and would be utilized upon completion of the two projects. Mayor King testified that this would permit the city for the first time to have large tracts readily available for industrial development. To a limited extent land for such use would become available in the city as it existed prior to the 1972 annexations but to a much greater extent lands would be available for this purpose in the newly annexed area to the east.

Additional evidence of the urban nature of the area consisted of testimony which disclosed that during this period of growth the value of vacant land has increased substantially. It exceeds the value the land would have for agricultural purposes, ranging from $2,000 per acre upwards to as much as $150,000 per acre in the area of Independence Center.

Witnesses on behalf of Independence testified that Independence needed to annex the areas in question. This need to annex was based on expected growth in population and on industrial and commercial needs. It was their position that sufficient area for

these purposes was not available in the city as it existed at the time of the decision to annex and that the only direction in which Independence could expand is to the east and northeast where the five territories are located. Witnesses for Independence, particularly its director of planning, explained that annexation of these five territories is absolutely essential to Independence. In addition to meeting a need for additional land they are adjacent to Independence, are next to the Little Blue River Flood plain area in Independence which will be developing as a result of the sewer and channel control plans and what occurs there vitally affects Independence. The witnesses testified that if annexation does not occur at this time, the placement and construction of streets, sewage disposal systems and other public utilities will not be controlled. There is no provision for proper juncture of streets. If these are not properly constructed, future maintenance costs will be prohibitive after development has occurred. In addition, Jackson County has no building codes. Such codes provide for safety of construction of buildings and houses and these features will be missing in some of the construction which will take place in the areas in question if annexation does not occur.

In response to plaintiffs' contention that Independence as it then existed had a high percentage of land classified as vacant, and hence did not need to annex, the witnesses pointed out that much of that so-called vacant land was not actually available to meet residential, commercial and industrial needs. Some was not usable because of steep grades or unacceptable terrain and some was in the flood plain. Some could not be used because underground mining for limestone was such that the surface would not support commercial or industrial construction. Some land was not available because the owners did not want to sell. Some owners are holding their land for future development. In addition, some of the land classified as vacant was not actually available unused vacant land. For example, land owned by an industrial or commercial plant in excess of the amount required

to meet zoning requirements is counted as vacant rather than occupied land even though it is not available for use by others. To illustrate, Lipton Tea Company has a tract which is several times the area required by zoning laws for its plant and parking requirements. The tract is landscaped and held for possible future expansion by Lipton. However, in figuring vacant land the excess over that required by zoning for plant and parking was classified as vacant land, even though it is not available to others. Likewise, in the case of residential property, any excess over and above the 7200 square feet required by zoning laws for a single family dwelling is classified as vacant land even though it is utilized as a part of the residential tract. An example given was a tract on which the home of one of the attorneys in this case was located. It is large enough that eight homes, each with the required 7200 square feet, could be built thereon. Although the whole tract was landscaped and utilized as yard for the one house, all but 7200 square feet was classified as vacant. Finally, Mr. Bullard, the Independence Director of Planning, testified that intensity of use of its land area by Independence was almost exactly the same as the intensity of use by Kansas City of its land area.

The foregoing constituted substantial evidence that Independence did not have sufficient vacant land to satisfy its needs.

■ Plaintiffs also attack the annexation of Territory 1 as unnecessary and unreasonable because it consists largely of the United States government's Lake City Reservation where Remington Arms Company operates an arsenal for the government and therefore no municipal services could be furnished to it. They argue that the Reservation furnishes its own services. We overrule this contention. In the first place, such an annexation is permissible. *Howard v. Commissioners of Louisville,* 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953); *Kansas City v. Querry,* 511 S.W.2d 790 (Mo.1974). Furthermore, there was evidence that after the decision in *State at inf. of Martin v. City of Independence, supra,* officials at the Lake City Reservation conferred with Independence officials concerning availability of

city supportive services, utilities and public safety. Mayor King testified that they had met to begin preliminary arrangements for the provision of those services. The United States did not seek to intervene or to oppose the annexation.

In view of our decision that the city's legislative decision to annex is to be sustained, we need not and do not reach other questions raised by the City of Independence attacking the right of plaintiffs to maintain this action. Likewise, it is not necessary to consider plaintiffs' cross-appeal wherein they contended that the trial court should have held the annexations void rather than voidable. That question is moot.

We hold that the evidence shows that the reasonableness of and necessity for the legislative decision by the City Council of Independence to annex the five territories was at least fairly debatable. Accordingly, we hold that the annexations were valid. The judgment of the trial court is reversed.

BARDGETT, C. J., and DONNELLY, RENDLEN, SEILER and MORGAN, JJ., concur.

HIGGINS and WELLIVER, JJ., not participating because not members of the court when cause was submitted.