MAYOR, COUNCILMEN AND CITIZENS OF the CITY OF LIBERTY, Missouri, a Municipal Corporation, Plaintiffs-Respondents,

v.

Rodney BEARD et al., Defendants-Appellants.

No. WD30742.

Missouri Court of Appeals, Western District.

March 30, 1981.

(Original Opinion filed Dec. 30, 1980).

Motion for Rehearing and/or Transfer Granted in part March 9, 1981.

Shook, Hardy & Bacon, Kansas City, for defendants-appellants; Charles L. Bacon, Jr. and John C. Dods, Kansas City, of counsel.

Jackson & Sherman, P. C., Kansas City, for plaintiffs-respondents; Don M. Jackson, Lindsay K. McFerrin, Kansas City, of counsel.

PER CURIAM:

Since this opinion was handed down, the Supreme Court has, by its order, sustained an application for transfer as to the limited issue of attorney fees and expenses claimed by defendants. The order further directs this court to modify the opinion by severance of the attorney fees and expenses from the issues in the underlying annexation case and to issue our mandate and proceed with publication of the opinion insofar as it affirms the trial court's judgment of annexation.

The clerk of this court is, therefore, directed to issue a mandate affirming the judgment of annexation and forwarding for publication the attached portion of the original opinion. The issue of the attorney fees, having been severed and transferred, is not adjudicated by this court pursuant to the transfer order, but is within the jurisdiction of the Supreme Court for further proceedings.

Before CLARK, P. J., and DIXON and SOMERVILLE, JJ.

DIXON, Judge:

The City of Liberty brought this action in declaratory judgment pursuant to § 71.015 RSMo 1977 (The Sawyers Act) to obtain approval of an annexation of 5.4 miles of unincorporated land lying east of the present city limits. The trial court found in favor of the annexation, and the defendant class of landowners appeal.

The landowners raise two issues: First, the sufficiency of the evidence to show the reasonableness and necessity of the annexation and the ability of the City to provide municipal services within a reasonable time, and second, the propriety of the trial court's ruling denying attorney fees to the landowners.

The case was ably tried and hotly contested. The trial proceedings have generated four volumes of transcript and a multitude of exhibits, maps, charts, photographs, and tables. The trial judge made extensive findings of fact and conclusions of law. The complexity and volume of the record almost defy summary judgment. The nature of the first point raised requires that a factual analysis be presented in the light of the landowners' contentions with respect to the sufficiency of the evidence.

The plaintiff, City of Liberty, began to adopt a series of holding ordinances in about 1962 designed "for. the purpose of study and review [of about 8 areas] . . . and to prevent . . . the encroachment on [sic] other cities for development which may be adverse to the City of Liberty." An ordinance authorizing the annexation of the area in question was enacted by the plaintiff-City on November 28, 1977. The petition for declaratory judgment, procedurally required by the Sawyers Act, § 71.015 RSMo 1977, was filed December 30, 1977. The court found the named defendants were a representative class of property owners in the proposed annexation area, and their answer was subsequently filed on May 1, 1978. The case was tried before the court beginning July 24, 1978. Findings of Fact and Conclusions of Law favoring the annexation were filed on October 18, 1978. Motions by both sides for reconsideration and amendment of the Order were overruled as was defendants' Motion for Allowance of Attorneys' Fees. A timely appeal by the defendant property owners was filed.

Defendants' first attack on the reasonableness and necessity for the annexation in question relates to population density. The City of Liberty, county seat of Clay County, is a special charter city located about 20 miles northeast of Kansas City. It now

consists of an area of 19.88 square miles. The City had an estimated population of 17,414 people in 1978. While this figure represents a doubling of the population since 1960, the density is still less than one person per acre. While there is enough open space within the existing City to theoretically hold a population of 100,000 people, less adjustments for commercial and public uses, experts testified that a City never totally saturates itself and a realistic population figure depends upon ownership, topography, and a number of other factors. Therefore, although the City's projected population of 35,000 in the year 2000 could arguably be supported by less than 50% of the land currently available, plaintiff City argues that the single factor of available land is not controlling and other factors must be considered as to the reasonableness of the annexation. The City's witnesses conceded, and the trial court found, that the City did not need the area to accommodate housing within its limits.

To counter that finding, the City notes that in Liberty there are many large land holdings which are not and will not be available for residential use, such as William Jewell College, along the east side, and Hallmark Cards, which owns some 2,000 acres of the north and east areas of the City. The nature of these holdings is such that they may be held for an indefinite period. The Odd Fellows Home, further south along the east side, the Precious Blood Seminary and the Immaculata Retreat in the south and southwest areas, and the City's large sewage disposal areas in the extreme south are similar areas. About 75% of the available land within the existing city limits has been platted.

The area sought to be annexed contains 5.44 square miles and lies to the *east* of the City. Defendants point out, and the court found, that the population trend and the growth and development pattern within the City indicates movement toward the *west* and northwest of the central business district, away from the area sought for annexation; and that no spillover has occurred from the City into the proposed area. Plaintiff City counters by noting that there *is* growth to the east but it is outside of the City limits in the proposed annexation area because of the large, private landholdings (such as Hallmark) in the eastern portion of the City that are not available for development.

Plaintiff City argues that the evidence shows the annexation was proposed because it was believed by the City officials and their professional consultants that the entire area was beginning to urbanize; that once urbanization begins on the doorstep of a city, it not only continues, but accelerates, making it essential for the City to control that urbanization and development. The proposed annexation area is developing, plaintiff argues, due, in part, to the large, unavailable land areas within the City limits. In addition, the area itself is attractive to the existing City and its services. The proposed area of annexation is within the very good Liberty school district, it is accessible to the metropolitan area by highways coming in from the south and southwest, and has all the earmarks of being a part of an urban area.

Since urbanization has begun in the entire area, and since it can be expected to continue and accelerate because the area lends itself to urbanization, the expert witnesses testified that it should be annexed by the City. The evidence was based on the experts' testimony that county government cannot cope with the sophisticated control of urban type development. As more and more development occurs in this area, there will be an increasing need by the people in the area proposed for annexation for city services. Because cities have no authority to control the area outside their limits, annexation is required to supply these services.

When the annexation was considered by the Council, it developed a policy statement of its rationale for annexation. This policy statement contained various reasons for annexation:

* To assure urban development in fringe areas is reasonable;
* To prevent pollution of ground waters flowing into or through the City;

* To maintain configuration of boundary lines;
* To prevent unsightly and hazardous approaches to the City;
* To provide growth space for urban development with freedom of choice;
* To protect the City's water wells.

The total area is currently primarily devoted to agricultural use and much of it is unplatted and undeveloped. There are still many operational farms in the area, but the evidence shows real estate values in the area are ranging from $1,800 to $3,000 per acre. The equivalent sales within the City were within the same range.

There is no small "city lot" development within the area, nor any recent commercial development, so that the real estate market is still predominantly rural in the sense that sales are by acre, but at relatively high prices. Some of the land is, by deed restriction, limited to agricultural use for a period of time and the land appraiser offered by the City found no actual development within the area.

In the whole of the 5.44 sq. miles that make up the area, there are 139 homes, 17 of which were built prior to 1970, resulting in an estimated population in the whole of the area of between 450 to 500 people. The quality of housing is very good, representing large investments by homeowners with large, beautiful, upper-cost-bracket houses. Almost all houses are on 3-acre lots, and the only subdivisions are relatively small. For example, there are 17 houses in the Dalles, and 5 houses in Lofty Meadows, where growth has been slow.

There are no "shanties" or "dog patches" developing within the area, and there was no evidence of any commercial development, other than along the extreme south, where a warehouse, a feed business, and a few other small businesses have been located for years. But, recent land sales for industrial purposes have occurred.

The area in question is readily and naturally divisible into thirds: a northern section generally beginning north of the path of Highway 10; a southern section lying to the south of Hillview Road; and, a middle section lying between the other two. Each of these sections has unique characteristics:

In the northern third, there are only about 14 houses in the approximately 2 square mile area. It is totally agricultural with little development occurring thus far. The existing city limits already encompass parts of tracts of property within this section because the limits are 330 feet east of the principal north-south highway. This has created a problem for developers holding this land by involving two governmental agencies, the city and the county, with different requirements and standards. In one case, in order to complete a development, the developer had requested Liberty to annex an 80-acre tract. The development, Lynwood Estates, has been done entirely under City standards. There is commercially zoned property at the extreme north of the area and in part of the large tract of land extending all the way to the northern edge of the proposed area for which a preliminary plan has been filed with the County.

In the center third, generally described as the area along Missouri Highway 10 going east from the City, there is a concentration of subdivisions of three-acre sized lots, 24 of which have sold. While the general character of the area is still rural, the growth in this area has been primarily residential, although one tract of three acres has been sold for $25,000 for commercial use.

The southern section currently has approximately 17 houses, three of which are new. The section has some subdivisions, but there has been no recent platting of less than 3-acre lots. This section also includes the largest park owned by the City, Ruth Stocksdale Park, acquired equally from donations and federal funds. Both the City Administrator and the City Council have recommended and acted not to expend funds in this park area until it is within the City. They considered it unwise to spend city funds on services and facilities outside the City when there exists a need within the City. In this same area, immediately west of Stocksdale Park, there is an open

area extending west to the existing east city limits. A developer has indicated a desire to buy and develop this property, as well as the property already within the City and to the west, which is zoned for industrial use, but such development will not be possible unless and until the annexation takes place. The developer wants to have it all within the City limits, and the existing boundary of the city is the only thing preventing development of a combination industrial and residential project.

The southern one-third also contains large tracts of potential industrial land, through which a new divided highway is being constructed. The City's water wells, its only source of water supply, are likewise located here. Industrial development already is taking place, one tract of six acres having been sold for $20,000 an acre to International Paper Company. An owner of property in this southern portion already has a chemical plant on the property and owns approximately 353 acres and intends to develop the tract as industrial property. The property is on the market for industrial use. There is no fire protection presently available for any industries which may locate there, and it is possible there would not be any unless the area is annexed to the City. The only possible source of protection otherwise would be a sprinkler system, but this would require getting water from a rural water district, which might not be able to supply enough water.

Industrial development in this part of the area could jeopardize the City's water supply by possible industrial waste going into the soil. The wells are about 100 feet deep and industrial wastes could contaminate the aquifer, or water bearing strata. This makes it necessary for the City to control industrial development and require protection against such potential hazards. The aquifer is the underlying stream of the Missouri River, and the flowage is such that all industrial wastes from the area would flow across the surface above the wells' source.

The trial court found that residential property values are still essentially rural.

Plaintiff claims there was undisputed evidence that the property prices in the area proposed for annexation are taking on urban price ranges, other than those industrial areas in the southeast corner which are even higher. A compilation had been made of all recent available property sales within the entire area; comparisons were made with prices of comparable sales within the existing City, and additional comparisons were made with sales of farmlands further to the east. This revealed that sales of land within the area proposed for annexation and sales within the existing City, both for commercial and residential use, were bringing similar prices, indicating an urbanizing scale of property values in the area. The developer of one larger subdivision, the Dalles, had acquired the land at $1,100 to $1,200 per acre. After he had platted the land as a subdivision, he sold the first portion for $3,333 per acre, and the last portion for $5,000 per acre. These are the same prices he is getting for similar lots in Lynwood Estates within the City, a nearby subdivision he developed after a prior annexation.

The evidence established that while the most significant development has occurred in the middle section, some urbanization is now occurring in both of the other areas, albeit at a slow rate.

The thrust of the City's evidence and argument in this case goes to the current services and enforcement of codes in the proposed annexation area under the County system as compared to what those services and the enforcement would be if the area were annexed and under City control. The county and the City have adopted all of the same building codes, such as the national electrical, plumbing, air conditioning and heating codes. Construction standards are identical in both City and county. The City does require licensing of certain trades which the county does not. The county's subdivision and building codes were "good." The City enforcement was better because it had more personnel to accomplish the task. While Liberty has one part-time and four full-time inspectors to enforce the codes by

actual inspections, the county has only one inspector to cover the entire county outside the incorporated areas. The City's Director of Community Development had served in 1976 for approximately four months as the Planning and Zoning officer for the county, and had learned during that time that there was no manpower available for enforcement of inspection. He had to use several city employees during that time for that purpose. The present county enforcement officer, called as a witness by the defendants, admitted that he had no specialized training for his duties, his only training being on the job for little more than a year. He testified that he was, nevertheless, charged with trying to enforce all the codes throughout the county. While he tries to view every site of construction in the county, the fact is that he does not have time to make all the inspections required by the various codes which includes electrical and plumbing connections and installations, for which the county does not require licensed installers. This has a direct effect upon the safety of the construction in the unincorporated areas.

The county has a zoning ordinance in force and effect in the area. County officials have cooperated with the City in zoning and planning matters and the Clay County Planning Commission also has required developers to cooperate with the City before new construction is approved. The City acknowledged that it had "very good cooperation" from the county and received notices from the county regarding rezoning applications and platting proposals providing the City with the opportunity to comment on any such proposal.

The City acknowledged that the *present* land use in the area, from a zoning perspective, was "good." Another witness for the City acknowledged that there were no zoning problems in the area. There are no "shanties" or "dog patches" springing up on the City's doorstep. One of the experts described the area as "predominantly rural and beautiful."

However, the evidence also established that the three-acre tract subdivision plats were being approved where the platting restrictions would not allow the flexibility to resubdivide. According to the experts, three-acre tract subdivisions often result in municipal bankruptcy because each parcel does not produce sufficient tax money to cover the services provided by the municipality. As a result, a common solution is resubdivision which would not be possible when platting restrictions prohibit such action.

Another problem involved in the proposed area has been the failure of the county to require adjoining subdivisions to have continuity of street patterns and connections. This has resulted in two subdivisions, the Dalles and Lofty Meadows, which are physically separated by less than the length of a football field, being inaccessible by road except by traveling a distance of 5 miles from one to the other. Thus, emergency vehicles can waste important time due to the lack of street connections. There was also evidence this problem was one of topography and terrain and the resulting substantial cost to tie the streets together.

None of the present roads into the area cause any connection problems for the City. The main roads are hard surfaced and maintained by the State or County. There was no evidence of any problems due to unsurfaced roads within the area. The main arterial streets into the area are already in existence. Whether or not there is annexation will not cause any street alignment problems for the existing City.

If annexed, the City has adequate personnel, equipment, and funds to provide any upgrading, surfacing, and maintenance of streets within existing subdivisions in the area. There was also evidence that the street standards are higher for the City; and the City would require developers of any future subdivisions in the area to install hard surfaced, asphaltic roads upon annexation.

Sewage disposal was an area of great concern. The Clay County Health Department has approved, among other systems, an aeration/chlorination system in residential developments with lot sizes of 3 or more

acres. This system utilizes a combination of a chambered motorized tank, which introduces an aeration process, with chlorine added by the homeowner. As the effluent moves through the system, it flows through a plastic pipe and into an open pond or lagoon, located outside the house on the property, and which is designed as an evaporation pond. The systems are considered secondary treatment facilities and, when properly maintained, all agree that the ponds provide an evaporation surface for the effluent and a satisfactory sewage system. There is no raw sewage in the ponds. They are permitted by the county, and they meet the State of Missouri and federal standards for sewage treatment. If the area were annexed, the City would only intend to limit further use of these systems, even though they would still be permitted on 3-acre or larger lots, so long as treatment continued to be satisfactory. Even if a sewer system were to be built by the City, property owners in the area would not be required to hook on to it, if their present systems were working properly.

The City's experts claim, through a series of photographs made of the ponds and eye witness testimony of the Liberty Special Projects Engineer, that these evaporation ponds are not being properly maintained, thus creating a potential danger to the public health. The county guidelines recommend that these ponds be fenced, that no surface water be allowed to flow into them, and that no vegetation be permitted to grow in them. Testimony showed that none of the ponds are fenced, a number of them are located within natural surface water drainage systems and so, arguably, are subject to the flow of surface water which could result in an overflow of the effluent downstream, and, finally, that some ponds have an algae growth on them.

The county requires a permit and inspects these systems when they are installed and, subsequently, on a complaint basis. A fencing *requirement* did not take effect until 1977 after most of the ponds in the area were already established. The manufacturer of these systems maintains them for a two-year period after installation. After that time, the homeowner is responsible for providing maintenance. About 70–80% of the systems are currently under maintenance contracts since the expiration of the initial two-year period. The manufacturer does *not* provide detailed instructions or warnings regarding maintenance, and the only warning device for a malfunction is provided by a small light on the outside of the system control panel normally located in the basement of the house.

While the City's experts testified to their opinion of a reasonable probability that these systems would fail and the ponds become cesspools of raw sewage exposing the area to risks of disease such as typhoid and hepatitis, there was no evidence of any pollution or contamination resulting from these systems to date.

Defendants argued that the City is in no better position than the county to "improve" the sewage services of the area should it be annexed. In support of this contention, defendants note that, with the exception of three "package" treatment plants serving the hospital, Hallmark, and a residential development in the northwest part of the City, some of the areas of the City are not connected to sewers and the City's raw sewage flows into lagoons, 18 acres of which are in the south and 80 acres to the west. The Clay County Sanitarian described the City's lagoons as pollution problems and the City's present system will not meet Missouri Clean Water Act Guidelines. The City has made no decision as to when and how it eventually will dispose of its own sewage in order to comply with state and federal requirements. For those businesses or subdivisions in the City which have package plants, the effluent from them is allowed to discharge directly into natural water courses.

Another factor which entered into the City's decision to annex this area is that it includes a substantial portion of the Rush Creek watershed. It is through this area that the City is completing the final stages of its plans for a major interceptor sewer designed to serve that part of the existing

city located within the Rush Creek watershed and the proposed annexation area. The basic reason for this interceptor is to provide a sewer line to move sewage from the present northeast part of the City to the sewage lagoons. The location of the line was basically an economic consideration. This is because the route through the annexed area would permit a gravity type interceptor.

The City's consulting engineer working on the Rush Creek interceptor sewer recommends that, since development is starting in some points in the area, the City should get ahead of the need for the sewer before that need gets critical. It would be an important economic benefit, both to the City and to the property owners in this area, if the annexation should take place because, by controlling building permits and platting of development, the City could cause houses and other development to be set back from the projected right of way.

Defendants' evidence showed that a major part of the proposed watershed to be serviced by this sanitary sewer is both outside of the City and outside of the proposed annexation area. It should be noted, however, that the area to be annexed is between the higher northern area of the City and any available sewage disposal site. At the time of the trial, there were no available actual plans for the interceptor. The project was still being studied by the engineer, who stated he was 9 to 12 months away from completion of his studies and it would be probably 5 years before anything could "happen." In addition, even if the Rush Creek interceptor is constructed within the projected 5 to 7 year time span, the City has made no plans for organization of districts or for construction of laterals, which would add additional time and money to the actual completion of sewer service. Voter approval will be required to get the needed funding, as with any capital improvement of a municipality. On the other hand, thousands of dollars have been expended on the planning and development of the system.

Plaintiff City also claimed an increasing hazard exists in the proposed annexation area due to increased surface water runoff resulting from the development in the north and northeast areas of the City and located in the Rush Creek drainage area. The City claims that the application and enforcement of storm sewer criteria is necessary to alleviate this problem and that watershed problems are best solved under one jurisdiction. The county has no such criteria, and the City has in force and effect a storm drainage code requiring protective development standards. Evidence showed that the county has allowed construction of housing to occur within the Rush Creek flood plain. Two houses in the area have already flooded twice and a building permit has been given for another house to be constructed in the same area.

On the other hand, the only evidence of any surface water drainage problems in the area was in connection with one inadequate culvert. While there was evidence that the City flood standards might benefit the area, there was no evidence of any inadequacy of the existing county standards. There was also testimony that surface water runoff problems occurring within the City could be controlled within the City and would depend upon what the City does. The court found no problem existing in the annexation area as a result of any excessive surface water runoff.

As for water service, the City draws its water supply from subterranean wells along the Missouri River channel outside the City's boundary. They are at the extreme southern boundary of the proposed annexation area about three quarters of a mile from the City's sewage lagoons. As discussed above, they are located in an area of potential industrial development, and the court found annexation to be appropriate in order to allow the City to control this development and protect its water supply against contamination.

Water in the area is provided by Water Districts 4 and 5, which are contract purchasers from Liberty. The City has opposed one District's attempts to buy water

from other sources. The City's rationale for this opposition is the need to control expansion even though the District's use of the City water has not contributed to the City's production problems. Water service and facilities as now existing are adequate for domestic service within the area although not for adequate fire protection, nor for any future expansion.

The ability of Liberty to provide for its own present customers is "borderline," a condition likely to worsen as growth takes place. While studies have been completed as to projected needs and the first phase improvements have been made to double the City's present capacity based on a 1975 study, a bond election will be required to complete phase two. The court found the districts provided satisfactory service and the take-over by the City which might improve them was remote and speculative. An offshoot of the water district service question entails the service of fire protection because as the City's expert testified, a city water district is planned for fire protection and not just for drinking and sanitation as in the county. The proposed annexation area has no available fire protection except in the case of danger to human life. Liberty has mutual aid fire protection agreements with other communities, but, as a matter of policy, it will enter the area in question only if a threat to human life is involved.

If this area were annexed, the City would immediately provide fire protection to the area with existing equipment and workforce. Such protection would be provided by the use of pumper fire trucks with varying load capacities. The first responding 1000 gallon pumper has sufficient capacity to extinguish an average residential fire and back-up could be called if needed. Ponds have also been charted in the area to be used for additional water. There are no fire hydrants in the area, and no plans to provide any until development warrants it. There are also no plans to build another station in the area, the nearest one on the east side being located near Hallmark. Money has been budgeted for one additional fire fighter.

Finally, since there is a lack of fire protection in the area, it has the highest fire insurance rating in Missouri, a class 10. If annexed, residential facilities would automatically get the advantage of the City's class 5 rating. For commercial buildings, however, the availability of services would affect the classification, not whether the building is located within the city or not.

Residents in the area testified that they are satisfied with the adequacy of the police protection provided by the Clay County Sheriff's Department. Response to calls from residents has been prompt and one resident has observed the Sheriff's Department on regular patrol in the area. There was no showing by the City's evidence or report on existing police protection in the area that the county services were inadequate. There was evidence that the Liberty police department was adequate to provide protection to the area in addition to extra money being budgeted for another officer should the area be annexed.

Schools in the Liberty area are administered by the Liberty School District, a district which is independent of the City. It was acknowledged that annexation would have no effect on the school district or system.

There was uncontested evidence that the City has the potential financial ability to service the area. The City's financial status is such that it has the capacity to issue general obligation bonds for up to $3,600,000 for general public purposes; $4,900,000 for streets and sewers. It could issue, with voter approval, $2,500,000 worth of general obligation bonds without any increase in the present tax levy. It has on hand funds in excess of $100,000 more than necessary to pay off the 1959 issue of water revenue bonds, which would benefit the new area if annexed, as well as the existing city, since it would be available for year to year capital water improvement. The wastewater capital improvement fund likewise has excess funds which would be available for capital expenditures for sewer lines, and which would be available to the residents of this area.

Liberty's bonds are rated "A", which means it is able to attract regional, if not national interest in the bonds. The City has already budgeted funds for street maintenance in the area, if annexed. Fire protection would be provided with no expenditure for additional manpower or equipment, as could police protection. The City would maintain and upgrade the existing streets in the area, and has the manpower, money, and equipment to do so very shortly after annexation. The policy of the City is that adjacent property owners assume 50% of the costs of street improvement and sewer construction. There was also testimony that the furnishing of a sanitary sewer system is not a "normal" municipal service; that these sewers are constructed by special benefit district assessments, both for sewer districts and lateral districts. Normal municipal services mean public safety services, street maintenance, snow control, planning and zoning, subdivision regulation and building inspection. All other services are provided through a service charge.

The present tax rate in the City is $1.81 on $100 assessed evaluation, of which $0.58 is for debt retirement on a present outstanding debt of $1,855,000.00. The City also has a $0.01 sales tax.

The court also found generally that annexation of the area in question would square up the City's eastern boundary, thereby facilitating the execution of its municipal functions.

## THE ISSUES ON THE MERITS, REASONABLENESS AND NECESSITY AND THE CAPABILITY OF PROVIDING SERVICES

The foregoing factual statement is unusual, in that it includes the contentions of the parties with respect to the inferences to be drawn as well as contrasting the conflicting evidence. Because the landowners' arguments are predominantly factual, the evidence and the inferences they have so strenuously argued is set forth. As a result, the statement of fact is about as favorable to the landowners as possible. This form of statement serves the purpose of appellate review of an annexation case un-

der § 71.015 RSMo 1978 and particularly so in the context of the landowners' contentions in this case.

Before undertaking an examination of the contentions made, a statement concerning the scope of this court's review and the generally recognized principles of law affecting annexation will be necessary.

Whatever statements of the scope of review may have been made in the cases heretofore, there can be no doubt as to the controlling principle at the present time. In *Binger v. City of Independence*, 588 S.W.2d 481 (Mo. banc 1979), Judge Finch, sitting as a Senior Judge and writing for a unanimous court, reiterated the principles of review of annexation cases. *Binger* holds that the determination of the issues of reasonableness and necessity and the ability to furnish services within a reasonable time is whether or not there was a fairly debatable issue. *Binger* also clarifies the question of burden of proof in such cases, holding that there is no burden of proof as such, but only a burden of proceeding with the evidence. Neither party has the burden of persuasion based on the preponderance of the evidence. The existence of a reasonably debatable issue requires deference to the legislative decision. The standard by which the terms, "reasonable and necessary," are to be judged is whether the annexation is reasonable and necessary to the proper development of the city. No rigid rules can be formulated for the application of that general test, but rather each case is a special problem to be decided on its own individual facts. *City of St. Joseph v. Hankinson*, 312 S.W.2d 4 (Mo.1958); *City of St. Peters v. Kodner Development Corp.*, 525 S.W.2d 97 (Mo.App.1975); *City of Des Peres v. Stapleton*, 524 S.W.2d 203 (Mo.App.1975); *Mauzy v. City of Pagedale*, 260 S.W.2d 860 (Mo.App.1953).

If any single formulation can be laid down, it is that "a case of reasonableness is made where it appears that the land annexed is so situated as to be adaptable to urban purposes and necessary or convenient to a reasonable exercise of the city govern-

ment." *City of Jefferson v. Smith*, 543 S.W.2d 547, 550 (Mo.App.1976); *City of Cape Girardeau v. Armstrong*, 417 S.W.2d 661 (Mo.App.1967).

■ The case law demonstrates that "reasonableness" and "necessity" are closely related concepts and that the need to the city for annexation is encompassed within the whole concept of reasonableness. *City of Woodson Terrace v. Herklotz*, 349 S.W.2d 446 (Mo.App.1961); *City of St. Joseph v. Hankinson, supra; City of Aurora v. Empire District Electric Company*, 354 S.W.2d 45 (Mo.App.1962); *City of Creve Coeur v. Brame*, 446 S.W.2d 173 (Mo.App.1969). Many of the decisions speak of the test as being whether the annexation is "necessary or convenient" for development of the city. *City of Cape Girardeau v. Armstrong, supra; City of St. Joseph v. Hankinson, supra; Mauzy v. City of Pagedale, supra; Dressel v. City of Crestwood*, 257 S.W.2d 236 (Mo. App.1953); *City of Jefferson v. Smith, supra.*

The landowners' attack is a straightforward claim that the annexation proposed was unnecessary for the development of the City. The attack centers upon factual areas which they claim make the annexation unnecessary.

■ The first factual attack is based on the evidence as it bears on the "need" of the City for the area for present or future development. On this issue, the landowners point out that the trial court found that the City had no need for the land for the present or future needs of the City. This finding was apparently predicated upon the evidence that there was vacant land in the City, the growth was to the west, and there was no spillover into the area. The City's witnesses also conceded there was no need for additional vacant ground to accommodate population. The landowners also argue that the fact that the land is largely agricultural and unplatted also demonstrates annexation is unnecessary.

The argument of the landowners is bottomed on the trial court's finding upon the evidence, which the landowners argue precludes the trial court from its conclusion of law that the annexation was necessary.

Despite the court's findings, there was evidence that very little land on the east of the City within its limits was available for development. There was also evidence that one subdivision on the east was planned but not yet started because of the fact it would contain land in the City and outside the City.

The City's evidence and the plats and maps demonstrate that the large vacant tracts were attributable to single ownerships, some of which, such as William Jewell College, religious institutions, fraternal orders, and industrial sites, were not now or likely to be available in the future for development.

The aerial photographs showing the relationship of the heavily settled portion of Liberty, the roadways into and through the area to be annexed, as well as the development in the area, also serve to show need. The central portion of the to-be-annexed area is closer to the center of Liberty than most of the southern and northern areas of the present City. The access demonstrated by the photographs would indicate the residents are probably served by the commercial establishments in the City as the most convenient to the area. The City and the area share a common school district.

Whether or not the evidence makes the issue of the need of the City in terms of direction of growth, vacant land, or spillover growth reasonably debatable, that factor alone does not determine reasonableness and necessity. The landowners argue that without that factor of need, the City may not annex. They take the broad position that without affirmative proof that the annexed land is needed for expansion in the sense of available land for development, the annexation must fail. They assert no case has approved annexation without such proof. Aside from the question of what "proof" is necessary in an annexation case, two recent annexation cases have approved annexation where there was substantial evidence that the annexing cities had available land within the existing limits. *Binger,*

*supra,* and *City of O'Fallon v. Bethman,* 569 S.W.2d 295 (Mo.App.1978).

The argument with respect to the agricultural nature of the area and the related question of land values has been dealt with in the case law in comparable situations. The area of annexation and Liberty itself are part of the metropolitan area of Kansas City.

Thus, in *Mauzy v. City of Pagedale, supra* at 865, it was held:

"In questioning the reasonableness of the annexation, it is no decisive factor that the annexed territory may be primarily indebted to the City of St. Louis rather than to the City of Pagedale for its development into an urban community and for the location of the larger industrial plants within its borders. The same thing could as well be said of all the other communities within the metropolitan area of the City of St. Louis; and perhaps the frank truth of the matter is that both the original territory and the newly annexed territory of the City of Pagedale owe their development to such common source. But instead of proving that the annexation was unreasonable, this circumstance actually supports the idea of a community of interest, which much of the evidence tends to disclose . . . ."

So also in *City of St. Peters v. Kodner Development Corp., supra,* it was objected that there was insufficient showing that the annexing city has "spilled over" into the area sought to be annexed. The court held at l.c. 99 that this narrow concept should not be required in considering annexations occurring in urban or suburban areas:

"Certain guidelines which have applicability to annexations involving a city or town located in an essentially rural area are of little benefit when dealing with urban or suburban areas. In the former cases people are locating within an established city and annexation becomes a necessity when the geographic limits are unable to contain the population desirous of locating in the city and its begins spilling over into surrounding land. But it is still the city or town, surrounded by rural or non-residential land, to which the population is affixing itself. A different phenomonon is involved when dealing with America's middle-age problem—urban spread. There the population is associating itself with a large metropolitan area, without regard generally to the particular city, town, village or county in which it is locating. Rather the considerations are proximity and access to an overall metropolitan job market. St. Charles County is in the midst of experiencing explosive residential and commercial population growth because of its proximity and access to the greater St. Louis area. The record here adequately shows that the St. Peters area has changed and is continuing to change from a rural area to an area of residential subdivisions and related commercial developments. Much of the proposed annexation area has been platted, developed or committed to such change. True, much of the area is still rural, but the evidence supports the conclusion that such usage is temporary. The evidence further supports the conclusion that the land values in the area to be annexed are high by virtue of their suitability for residential development, not because of their value as agricultural land."

Many decisions have recognized that an increase in land value such as was shown here shows a lack of adaptability for agriculture and a change to adaptability for urban uses. *City of Woodson Terrace v. Herklotz, supra; City of Des Peres v. Stapleton, supra; City of Cape Girardeau v. Armstrong, supra; City of St. Joseph v. Hankinson, supra; Mauzy v. City of Pagedale, supra; State ex inf. Taylor ex rel. Kansas City v. North Kansas City,* 360 Mo. 374, 228 S.W.2d 762 (banc 1950); *City of Bourbon v. Miller,* 420 S.W.2d 296 (Mo. banc 1967); *Faris v. City of Caruthersville,* 301 S.W.2d 63 (Mo.App.1957).

If review in this case were that undertaken in the ordinary equity case, the "findings" of the court might be of significantly greater import. *Binger* was decided after the trial of this case and its holding affects

the weight to be given to the trial court's "findings of fact."

There are two answers to this first issue posed. First, the evidence as to lack of need is not entirely uncontroverted. While the findings of the trial court might be sustained upon the preponderance of the evidence, in a court tried case under the rule of *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976), that does not control under the test of *Binger, supra.* It cannot be said that the issue of the City's need for the area is not reasonably debatable. *City of O'Fallon v. Bethman, supra,* addressed and rejected a similar contention using the following language:

> "The fact an area in one direction of a city is currently developing in terms of population and a proposed area is not *does not, however, preclude an inquiry into the reasonableness of the proposed annexation.* A finding that a city is attempting to force itself into an unnatural growth pattern is more a conclusion to be reached *after other factors have been considered rather than a factor in itself on the ultimate issue of reasonableness."*

(Emphasis added). 569 S.W.2d at 303. So also, in *Binger, supra* at 488, the court, addressing the contention of available vacant land, said:

> "In addition, some of the land classified as vacant was not actually available unused vacant land. For example, land owned by an industrial or commercial plant in excess of the amount required to meet zoning requirements is counted as vacant rather than occupied land even though it is not available for use by others . . . ."

■ The second factual area upon which the attack focuses is the evidence concerning the need for the City to control growth in the area.

Upon this claim the landowners reiterate their claim of a lack of need of the area for growth and what has already been said about that aspect of the case need not be repeated. The landowners' claim on this branch of the case is again that the findings of fact of the trial court preclude any finding of necessity for the annexation.

The landowners point to the presence of control by Clay County of zoning and sewage disposal and the absence of any deleterious developments characterized as "dog patches." They assert that the court findings show there is no problem about surface water control or flood control. They even except to the finding that some development is being hampered by dual control of contiguous areas suitable for development. They argue that the presence of industrial development alone is insufficient to justify annexation citing *City of Odessa v. Carroll,* 512 S.W.2d 862 (Mo.App.1974). *City of Odessa* stands for no such broad principle. A reading of that case demonstrates that industrial growth outside of the city was only one of the many factors entering into the decision in that case.

What the landowners' argument totally ignores is the countervailing evidence and inferences from the evidence which were before the trial court. The City's proof unquestionably showed a trend towards urbanization in the area. Also shown were a lack of enforcement of the county zoning and building codes and regulations, a complete lack of fire protection in the area, a failure to prevent the building of houses and other structures within the flood plain, a possibility of hazard from existing sewage disposal plants if not properly maintained, a reliance by the residents of the area upon the City of Liberty for schools, shopping and recreational facilities, and the location of a major city park within the area to be annexed. Many other areas of expert testimony indicate a need for city control of this area. Demonstrable from the exhibits filed in the case are certain topographic features relating to the development of the City's sewer system. The area to be annexed straddles the Rush Creek watershed, the northern portion of the watershed being within the present city limits of the City and the flowage being to the south. The City plans a major interceptor sewer in the area and presented evidence that the development of that major sewer system would be aided by the annexation since the City

would then control the erection of structures in the area. Substantial funds have already been committed to that project. The control of development would prevent the creation of an insuperable economic obstacle to the sewer which the erection of houses and other structures over the natural path of such a sewer system would pose. It is unnecessary to further relate the evidence on this issue. Reference to the statement of facts shows that the evidence was not entirely one way on the issues presented. What has heretofore been said with respect to the test of appellate review applies with equal force to this branch of the case. The issue concerning the necessity of the City to annex this area in order to control an area which has such a community of interest with the City and for the proper development of the City is a reasonably debatable question. *City of Jefferson, supra.*

■ The final prong of the defendants' factual attack on the annexation centers upon what the landowners' claim is a lack of proof that the City can furnish normal municipal services to the area within any reasonable time. The single factual assertion in support is that the evidence does not show that the City could furnish sewer services to the annexed area within a reasonable time. The City counters by saying that sewer service is not a normal municipal service. There is no need to recapitulate the evidence on this point; it is set forth in some detail above. The argument by the landowners is that the City must provide municipal services which the municipality is *presently providing to its own citizens* within a reasonable time, citing *City of Jefferson, supra.*

Two factors undercut this argument: First, the City's position—that normal municipal services in the sense of the statute does not include the construction of interceptor sewers and creation of sewer districts—has merit in the context of what actually occurs in municipal development. Sewer services are normally provided in relationship to the need as it develops. Oftentimes, developing areas utilize a form of

sewage treatment compatible with the density of population and then are ultimately transferred to a municipal sewage system as the need arises from increased density of population. The evidence here supports just such a developing need. Second, and of most importance, is the fact that sewer systems simply do not exist in a vacuum and to require a city to be able to provide a sewer system for vacant land within the period of construction of such sewers would be to limit the City's power to annex. Such a rule would require a vast expenditure of money which might not be utilized for many years. Whether the question of sewer services is considered in the context of "reasonable time" under the statute which certainly would be longer for the providing of sewer service than it would be for police and fire protection or whether it is considered in the context of the necessity for a plan and the capability of providing such sewer service, the proof here is certainly adequate on either basis. The plans for the Rush Creek interceptor sewer cannot be said to be visionary or impractical. They are engineering plans well along in development and are not subject to the vagaries of funding which existed in some of the cases cited by the landowners. Unlike *City of Farmington v. McClard*, 437 S.W.2d 114 (Mo.App.1969), the topography in this case dictates that the interceptor sewer for the Rush Creek watershed must be built and to that extent the annexation of the land is a condition necessary for the building of the sewer, while in the *McClard* case, the sewer only needed to be built if the annexation were approved.

The proof in this case is certainly sufficient to show that the City of Liberty is capable of and can immediately provide fire, water, and like municipal services, and that it is presently capable of and has firm plans for the creation of the necessary municipal sewer system when the need for that system is existent. There are incidental benefits to both the annexed area and to the City of Liberty which have not heretofore been discussed that support the reasonableness and necessity of the annexation. There is no question but what the extension

of fire protection will drastically reduce the fire insurance rates for the inhabitants of the annexed territory. The City's water wells will be protected by control of industrialization in the area of the City's water supply. The boundaries of the City will be straightened and the present fringe development along arterial highways will be lessened by opening the area to city development away from such highways.

On the basis of all of the foregoing, it must be concluded that the trial court was correct in its conclusions of law and that the City of Liberty has by its proof shown that the issue of the propriety of the annexation and the ability to provide municipal services is a reasonably debatable issue and, as such, within the legislative prerogative of the City Council of Liberty.