**238**

James SEARS, et al.,
Plaintiffs-Respondents,

v.

CITY OF COLUMBIA, a Municipal
Corporation, Defendant-Appellant.

No. WD 32646.

Missouri Court of Appeals,
Western District.

Sept. 13, 1983.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Nov. 15, 1983.

Application to Transfer Denied
Dec. 20, 1983.

Raymond C. Lewis, Jr., Columbia, for defendant-appellant.

James C. Butcher, Columbia, for plaintiffs-respondents.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

This appeal follows a trial court memorandum decision and judgment finding un-

constitutional and invalid certain tax bills sought to be assessed against plaintiffs-respondents (comprising some 23 of 41) abutting landowners (Landowners), by the defendant-appellant City of Columbia (City) for widening, paving and other reconstruction made by the City on Oakland Gravel Road (Oakland Gravel). The trial court found the proposed tax bills invalid on the ground that the plaintiffs-Landowners' properties had not been benefited, and that the actions of the City in assessing the "improvements" were arbitrary and capricious. Issuance of and levying upon the tax bills had been temporarily enjoined by the court prior to trial. After a three week trial the court took the case under advisement and found sufficient abuses had occurred to entitle it to judicially review the legislative decisions of the City. In its judgment, besides holding the tax bills invalid, the court declared unconstitutional, null and void the actions, resolutions, council bills and ordinances of the City as they pertained to tax bills to the Landowners on Oakland Gravel. The trial court also made permanent the temporary injunction against the City proceeding any further with the passage of Ordinance # 385–76 which had authorized the assessment and issuance of special tax bills against the Landowners' properties. The court further enjoined the assessing or levying of *any* special tax bills against the 23 plaintiff-Landowners for the reconstruction of Oakland Gravel.

The City raises some seven points and a quantity of sub-points on appeal. All these points are denied and the judgment of the trial court is in all respects affirmed.

As the facts and circumstances surrounding this case are quite complex a brief history here seems in order. Many of the quoted portions of the facts herein emanate from Judge Conley's memorandum decision. Oakland Gravel was first used as a road for wagons going to the coal mines located north of Columbia. It originally had a dirt surface which was changed to gravel then shale in the 1930's. It was later rocked, and was finally improved to an oiled "black-top" road in the early 1940's. This improvement was done at the cost of the abutting property owners. The owners were charged $2.00 per foot for maintenance. During this period of time the individual tracts of land along Oakland Gravel were much larger than the average in-town lots and more closely resembled land platted for "limited" agricultural use. Prior to this project Oakland Gravel, a two lane street, ranged in width from 16½ feet to 24 feet. There were no curbs or gutters or sidewalks. Most of the properties are zoned single family residential. Many of the homes fronting on Oakland Gravel are set back a substantial distance from the road (an average of 109 feet) and have large well cared for lawns and trees planted to the street. The largest tract involved in this suit is 25 acres. This area was annexed by Columbia sometime in 1971.

Up until the time of the "improvement" in 1975, Oakland Gravel was a road providing a very attractive semi-rural residential setting for the homes along the tree-lined road. The road served the people in the immediate neighborhood quite adequately as a "residential" street. There had been no subdivision of the lots. With the growth of industry and subdivisions in Columbia, the City Planners and City Council determined the need for a traffic corridor to the north to be established in the area around the Oakland Gravel residences. In the vicinity of the area, two schools were built in the early 1970's. Also new residential areas had been built as well as an airport, juvenile justice center and a municipal swimming pool.

In its move to upgrade Oakland Gravel the City reclassified the reconstructed and widened street from what the court described as "a meandering 20 foot residential street" to a concrete 38-foot "residential collector" street, changing its rural "country lane" appearance to a prototype of current suburbia with concrete sidewalks, gutters and curbs at the roadside. The road "improvement" or reconstruction also changed the nature and quantity of the traffic. The City, following its stated policy that every abutting landowner in Colum-

bia, "owed the general public a 32-foot street," had the Public Works Department compute costs and apportion to the abutting property owners that portion of costs to have paid for a 32-foot street. Those costs resulted in the tax bills in question. The City was to pay for the rest of the construction cost and of all other improvements. This unwritten policy of the City was based on the rationale that a 32-foot improved residential street is of "special benefit" to the individual abutting home owners. The underlying issue in this case is whether any special benefits as opposed to general benefits accrued to the landowners' property along this 5750-foot section of Oakland Gravel due to the City's reconstruction. The properties involved in this lawsuit have generally between 100 feet (equating to a tax bill of $1,823.18) and 1329 feet ($24,238.98) abutting Oakland Gravel.

Dozens of witnesses, hundreds of exhibits and over 1500 pages of transcript supplemented many pages of stipulated facts. Such additional facts will be presented with the evaluation of the relevant point of error relied upon by the City.

## I.

The City's first point on appeal contends the trial court erred in reviewing the legislative determination made by Columbia's City Council as to the issue of benefits, and particularly erred in finding five purported abuses and using them as the pretext for judicial review of the issue of benefits. A) Columbia further contends that none of the five abuses were pleaded by the Landowners nor referred to in their petition nor litigated at trial; and such findings of abuse were contrary to the uncontradicted evidence; B) the City next alleges that the purported abuses, even if proved would not justify judicial review as they were incidental in nature; C) they constituted minor or technical irregularities; and, D) were not prejudicial to the Landowners in any way. This multi-faceted point is ruled against the City.

The City's first contention about the trial court's finding of five abuses as being a pretext for judicial review is linked to its last point on the scope of judicial review. Paraphrased in part and without use of quotation marks, Judge Conley made the following detailed findings which served as the basis for findings of abuse and arbitrary action by the City.

1. Columbia is a home rule charter city.

2. The City on February 21, 1972, passed Council Bill No. 59–72 calling for the reconstruction of Oakland Gravel Road from Vandiver Road (now Holly Avenue)[1] north to the city limits, payment for construction to be made by special tax bills against abutting property not to exceed $13.70 for asphaltic concrete per linear property front foot; the street was reconstructed of asphaltic concrete to a width of thirty-eight feet (38′) with concrete curbs and gutters and a concrete sidewalk on the east side running the length of the project.

3. On February 19, 1973, the Council passed Bill No. 43–73(a), Ordinance No. 5969, approving and adopting the plans for reconstruction of Oakland Gravel Road and setting a maximum tax bill of $13.70 per front foot.

4. The City on March 27, 1973, passed Ordinance 5992 (Council Bill No. 89–73) accepting the contract and bid of Richardson and Bass Paving Company in the amount of $347,062.40 for the Oakland Gravel Road reconstruction from Holly Avenue, north to the city limits.

5. On March 10, 1975, the Council passed Ordinance No. 6615 releasing Richardson and Bass from that part of their agreement pertaining to the Oakland Gravel Road construction under the contract previously approved by Ordinance No. 5992.

6. On April 7, 1975, the Council passed Bill No. 128–75 resolving that the cost of construction had increased to $350,000.00 and, thus finding it necessary to increase

---

1. The project as originally contemplated extended another 825′ southward to Vandiver Drive. Without that portion, the length of the finished project covered 5750 feet.

the amount to be assessed against abutting property owners from $13.70 to $18.60 per front foot.

7. The City on June 2, 1975, passed Ordinance No. 6696 (Council Bill No. 200–75) accepting the bid of Richardson and Bass for the reconstruction of Oakland Gravel Road from Holly Avenue to twenty feet (20′) north of Grace Ellen Drive, (the length of the project being shortened from that which was called for under the original contract, Ordinance No. 5992), for the amount of $346,237.35.

8. Reconstruction was begun on June 16, 1975 and was completed on or about December 1, 1975 at a total cost of $394,144.72.

9. On January 5, 1976, the City accepted the final engineer's report and approved the construction as completed.

10. That defendant City, on October 4, 1976, passed CB 385–76, Ordinance No. 7194 which assessed and issued special tax bills against plaintiffs' properties and other abutting Oakland Gravel Road, the amounts of assessment ranging from $10.93 to $18.23 per front foot; that no evidence was presented to explain the variance charged the different property owners; and that the City Manager and City Councilman who testified were unable to explain the variation in amounts charged, but the Public Works Director testified that owners of corner lots may have been charged less.

11. On April 5, 1976 the Council passed an Ordinance (No. 7010) assessing special tax bills for the paving of Fay Street (another project), which was constructed in 1975 as a thirty-two foot (32′) residential street; that no evidence was presented to explain the varying amounts charged abutting property owners which ranged from $12.50 to $17.45 per front foot.

12. That the City on July 7, 1975 passed Ordinance No. 6727, which set the maximum tax bill for construction on Vandiver Drive (another project), including that part of Oakland Gravel Road extending north from Holly to new Vandiver Drive at $13.75 per front foot; that this section of Oakland Gravel is of the same size and type construction as that part of the road abutting plaintiffs' properties; that no evidence was presented to indicate the discrepancy between the amount tax billed for this portion of Oakland Gravel and the greater amount plaintiffs were billed for their abutting properties.

13. On June 16, 1975, by Ordinance No. 6715 the City elected to proceed with still another road construction project on Vandiver Drive from Oakland Plaza to the Ramada Inn, fixing the maximum tax bill at $13.70 per front foot; that this project was completed *after* this road construction was completed on Oakland Gravel; and that on June 21, 1976, defendants by Ordinance No. 7083 assessed tax bills against abutting property owners on Vandiver Drive at amounts ranging from no assessment to the fixed maximum of $13.70, with one assessment at $2.48 a front foot; that there was no evidence indicating or proving that the wide range of difference in amounts charged in the tax bills for Vandiver Drive as compared to Oakland Gravel Road, were based on any differences in "specific benefits" occurring to the abutting property owners. (Emphasis added here and throughout the findings).

14. In June 1976, the Council passed an Ordinance setting the maximum amount of $16.00 which could be assessed by tax bill for street improvements against abutting property owners.

15. The City's assessments with such wide differences in the amount charged on various streets was without regard to size, type or length of the street, and without regard to special benefits accruing to abutting property owners assessed properties based upon the cost of a thirty-two foot (32′) residential street; and that the relief it gave some owners was not based upon special benefits.

16. That Article IX, Section 71 of the Columbia City Charter provides that public improvements may be paid for in whole or in part out of the *general funds,*

or out of the *public improvements fund* herein authorized, or out of the proceeds of *bonds,* or in whole or in part out of *special assessments on benefited property,* or by special tax bills evidencing such assessments; that Section 74 provides that all proceedings to make any public improvements, except emergency work or repairs requiring prompt attention and ordinary maintenance work shall be begun by adoption of a resolution by the Council declaring the necessity for such improvement, and stating the nature thereof and the method of payment therefor; that Section 75 provides that upon the adoption of such resolution, the Council shall provide for and give *adequate notice* of a *public hearing* in respect to all improvements to be paid for by special assessments.

17. The City on May 20, 1972 held public hearings on the construction of Oakland Gravel Road from Holly, (this project) north to the city limits and for construction of Blue Ridge Road, and the maximum tax bills were set at $13.70 per front foot; that public hearings on the construction of Vandiver Drive from Oakland Plaza Subdivision to nine hundred and fifty feet (950') west thereof were held on September 5, 1972 and the maximum tax bill was set at $13.20 per front foot for asphaltic concrete; that public hearings setting the maximum tax bills at $13.75 per front foot for construction on the Vandiver Drive Route b intersection, including a section of Oakland Gravel Road were held on February 2, 1973 and April 2, 1973, respectively; and that a *public hearing* on the *necessity to raise* the *maximum tax bill on Oakland Gravel Road* from Holly Avenue, north to the city limits *from $13.70 to $18.60 per front foot* was held on April 28, 1975.

18. That defendant, on *April 28, 1975* also passed Ordinance No. 6651, declaring it to be in the public interest to proceed with construction of Oakland Gravel Road from Holly to twenty feet (20') north of Grace Ellen Drive (a change in this project) and that *no public hearing was advertised* and held and *no resolution*

adopted *declaring the necessity* for this construction; and that *the plans and specifications were changed* and the project shortened from the north city limits to a point twenty feet (20') north of Grace Ellen Drive.

19. That Section 14.560, Revised Ordinances of Columbia provides that the *cost of paving,* guttering and otherwise improving any alley and the *roadway part of any street,* including street intersections, shall be charged against the lots and tracts of land fronting or abutting on the streets or alleys so improved along the distance improved; *that said Ordinance is inconsistent with the provisions of the Columbia City Charter* which states that the cost may be tax billed against *benefited* properties.

20. Council Bill No. 59–75 (passed in March 1975) amended Section 14.560 to establish the *Special Assessment Board of Appeals;* that among other provisions this amendment set out qualifications which must be met by a property owner before acquiring the right to appeal; that the *amendment* provided that a *property owner had no automatic right of appeal unless* the *tax bill* assessed *exceeded* one third *(⅓)* of the assessed valuation for improved *residential* property, or one half, (½) of the assessed valuation of the improved commercial property, or two (2) times the assessed valuation of unimproved commercial properties zoned for residential or agricultural use, or three (3) times the assessed valuation of unimproved land zoned for commercial or industrial use; that said amendment also provided that under *certain circumstances the owners of corner lots* would be *entitled to* a forty percent (40%) *reduction* in their tax bill *unless* they *filed an appeal* with the Board of Appeals *to determine benefits,* in which case they would be deemed to have *waived* the automatic reduction; that the amendment further *provided for relief on through lots* fronting on another street or alley to the rear, but owners would also lose such automatic reduction if an appeal

to determine benefits was filed; that the amendment provided that the *City Council may grant* an appeal to property owners upon request *if not automatically qualified* under the provisions of the amendment; that the factors which the Board was ordered to consider including: actual value of the property, prospective use or development of the property, objective benefit of improvement to the property at present, objective benefit of improvement to the property in the future, access of property to improvement and traffic load changes on improved street based on actual and prospective use of the property; that said instructions afforded the Board wide latitude to speculate about benefits, and to use some guidelines that have little or no relationship to actual benefits that may accrue at the time of reconstruction or immediately thereafter, and that there was *no instruction to the Board to make an apportionment between general and special* benefits, and by the terms of the amendment, the Board was not to consider general benefits.

The trial court found that the standard accepted by the defendant of *using* an *assessed valuation* to *determine* the *right* of property owners to appeal *bore no relationship to real value or special benefits.* The City Council without consideration of special benefits and without considering any possible apportionment of special benefits to general benefits, denied for no apparent reason certain of the plaintiffs the right of appeal. The trial court found Ordinance 14.560, as amended, inconsistent with itself, and the City Charter.

Based upon these facts the court made these conclusions of 5 arbitrary and capricious abuses of legislative discretion by the City.

1. The project was changed substantially in length without benefit of a public hearing.

2. The costs were apportioned differently for different portions of the project. There is no reasonable showing as to the means employed to set the costs.

3. The determination as to the "costs" or pro rata share of a 32 foot street was made administratively within the public works department.

4. Certain property owners were allowed an appeal through the Board of Appeals which was denied to others.

5. The resolution of the defendant increasing the estimate of cost of the project and stating as the reason therefore: "because of delays due to litigation instituted by property owners abutting the street improvement, the street construction project has not been yet begun, the street construction project must now be rebid," cannot be assumed to refer to this action (commenced on June 23, 1975), but refers back to litigation arising from the original condemnation suits filed by the City in 1973. The conclusion was that the City's actions were because the Landowners refused to convey their property for the right-of-way for $1.00.

The following thumbnail sketch of Council actions may prove helpful:

February 21, 1972 (CB 59–72)—To reconstruct Oakland Gravel from Vandiver north to city limits, 38' wide, $13.70 per foot cost

March 8, 1972—Informal meeting between Public Works Department and Landowners, City offers $1.00 for right-of-way

March 20, 1972—Formal hearing on 59–72

April 3, 1972 (5731)—Ordinance to condemn land based on traffic congestion and population growth

May 30, 1972—Meeting held between Public Works and Landowners regarding land acquisition

February 19, 1973 (5969)—59–72 approved, change in south boundary of project from Vandiver to Holly, north boundary brought south from city limits to 20' north of Grace Ellen. No hearing held

March 26, 1973 (5992)—Construction contract awarded

April 9, 1973 (6006)—Condemnation ordinance (5731) repealed

May 21, 1973 (6030)—Construction easements granted

March 10, 1975 (6615)—Contractor released from contract ($347,062.40)

March 17, 1975 (CB 59–75 (6635)—Special assessment Board created

April 7, 1975 (CB 128–75)—Maximum assessment raised, charge now $18.60 a foot, refers back to CB 59–72 (1972)

April 28, 1975 (0651)—Bids advertised, project from Vandiver to 20′ north Grace Ellen Drive $18.60 a foot. Hearing held on charges.

June 2, 1975 (6696)—Bid awarded

June 23, 1975—The petition in this case was filed

January 5, 1976 (6918)—The project was accepted—total cost $394,144.42

July 19, 1976 (7115)—Special assessment Board abolished. After abolishment of the Board the city established a maximum front foot cost, "based on what seemed to be a normal charge at that time." In 1976 this charge was pegged at $16.00

October 4, 1976 (7194) (CB 385–76)—Tax bills in question issued ranging from $10.93 to $18.23 per foot.

The issue of benefits and the City's last point on scope of review are dealt with here.

■ The findings of the trial court are borne out by the evidence. Although dealt with in other parts of this opinion the five items denominated as abuses were indeed manifestations of arbitrary and unreasonable activity by the City toward the Landowners in determining special benefits. The changing of the project, the lack of hearings, the disasterous experiment with the Special Assessments Board, the raising of the charge to Landowners while projects located adjacent or near to this one had lower bills, and with no apparent thought being given by the City to there being any special benefits to the Landowners make a case for judicial review.[2] *Kansas City Southern Railway Co. v. Road Improvement Dist. No. 3,* 266 U.S. 379, 45 S.Ct. 136, 69 L.Ed. 335 (1924). The City says the facts here do not even rise to the court's ever questioning the legislative discretion exercised by the City. *Village of Edina v. Joseph,* 264 Minn. 84, 119 N.W.2d 809 (1962) also cited by the City involved the upholding of the municipality, on similar facts by the Supreme Court of Minnesota, but only after a careful review of the evidence by that court. The City says in essence there should be no judicial activity in a case such as this, or that the courts must always rubber-stamp Council action of a charter city. That is not and should not be the law—there is judicial review, but limited in scope. *DeFraties v. Kansas City,* 521 S.W.2d 385 (Mo.1975) is a case where the Missouri Supreme Court in facts similar to these did undertake review of a street reconstruction and enjoined the assessments by the City, saying the detriments outweighed the benefits.

The United States Supreme Court as far back as 1898 commanded that some inquiry be made in cases where special benefits are determined. *Village of Norwood v. Baker,* 172 U.S. 269, 278–79, 19 S.Ct. 187, 190–91, 43 L.Ed. 443 (1898).

■ The first issue to be resolved is the scope of judicial review. The decision for reconstruction of Oakland Gravel by the Council was a legislative action clearly within the purview of the City. Judicial review is limited to whether the legislative determination was 1) arbitrary, 2) induced by fraud, collusion or bad faith, or 3) was in excess of City powers. *Parking Systems, Inc. v. KCDR Corp.,* 518 S.W.2d 11, 15 (Mo. 1974). In this case the *only element* relevant is whether the decision and implementation of the project to reconstruct Oakland Gravel and particularly the determination of special benefits was done in an *arbitrary* manner. The burden was on the Landowners here to show arbitrariness and unreasonableness. Unless the conclusion of the Council is so clearly arbitrary and unreason-

---

**2.** After finding abuse of legislative discretion the trial court found and concluded the Landowners received no special benefits from the project, but rather the reconstruction amount-ed to a detriment. Since no special benefit could be shown to accrue to the Landowners the court voided the tax bills and permanently enjoined such collection of them by the City.

able it will not be judicially overturned. If City action is reasonably doubtful or fairly debatable then the court's opinion can't be substituted for the City's. *Parking Systems, supra,* at 16.

Therefore the standard of review in this case is not, as the Landowners suggest, under *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976) or Rule 73.01. The trial court in reviewing the Council's decision is not the trier of fact as in a *Murphy v. Carron* case, it reviews the propriety of the legislative decision, and if that decision is fairly debatable and is supported by substantial evidence of reasonableness and necessity, the legislative decision must be upheld—it may only be overturned if found to be arbitrary, unreasonable, and clearly erroneous. *J.C. Nichols Company v. City of Kansas City,* 639 S.W.2d 886, 891 (Mo.App. 1982). *See also State ex rel. Payton v. City of Riverside,* 640 S.W.2d 137, 141 (Mo.App. 1982) (under certain circumstances ordinances generally valid may be held invalid as being unreasonable and arbitrary).

That standard is made impossible to apply here, because it is hard to determine any rhyme or reason to City Council's actions or decisions. The City obviously had no codified policy on the "unwritten rule" of a 32 foot wide street being an obligation of each homeowner. The Ordinances adopted in a long tortuous path of this project provide no basis for a reasonable explanation of action taken by the City. The City's legislative action was marred by indecision and no apparent forethought. Why this street had to be 38 feet, how charges were apportioned and the cost of a 32 foot wide street were not pre-planned. The benefits to homeowners, if any, were not documented by the City and no effort to do so was done until this litigation commenced. There existed no way in the legislative process for Landowners to be heard on special benefits and to have their assessments

changed accordingly.[3] The trial court could not review a transcript, an administrative hearing, nor observe documents to make a decision.

 In cases like this where the City has taken an action through its legislative branch there is a presumption the legislative action taken cannot be overturned in the courts unless clearly arbitrary. Trial and appellate review is on the record to determine if there was substantial evidence to support the Council's decision to widen and its method of assessing special benefits. *Binger v. City of Independence,* 588 S.W.2d 481 (Mo. banc 1979); *Lakewood Park Cemetery Association v. Metropolitan St. Louis Sewer District,* 530 S.W.2d 240 (Mo. banc 1975). There is no way to reverse a legislative function if the reasonableness of the City's action is fairly debatable, *Binger,* at 485, and this nor any other court can only set aside the city action where action is as was here arbitrary in the court's judgment so as to make the City action palpably unreasonable. *Binger, supra,* at 484. *See also City of St. Joseph v. Hankinson,* 312 S.W.2d 4, 9 (Mo.1958); *City of Olivette v. Graeler,* 369 S.W.2d 85, 96 (Mo.1963).

The Landowner must carry the burden of showing the reviewing court that under no reasonable theory whatsoever can it be said the improvement confers a special benefit. Is there any reasonable basis the local officials could have determined a special benefit existed, or conversely was there no reasonable theory the local officials could have found a benefit? If no reasonable theory of benefits existed, such a finding was an abuse of discretion and as a result of arbitrary action. This is the rational basis test recognized in Missouri and governs court review here. *De Fraties, supra,* at 246, 248. Note, Municipal Law—Special Assessments for Street Improvements—The Standard of Review, 41 Mo.L.Rev. 457 (1976). In this

---

**3.** *See e.g. Kansas City Southern, supra,* where the Arkansas legislature had hearings, and local assessors appointed by the county court had heard matters on special benefits and assessments as to particular parcels, *City of San Diego v. Atchison, Topeka & Santa Fe Ry. Co.,*

45 F.(2d) 11, 12 (9th Cir.1930) where commissioners were contemplated to review benefits as to parcels and then the Council to review the report, and *Fluckey v. Plymouth, infra,* where commissioners heard evidence on the project.

light the 1500 plus page record must be examined—has the City gone beyond being presumably correct. Is it here arbitrary and unreasonable? *See also, Goodson v. City of Ferguson,* 345 S.W.2d 381, 384 (Mo. App.1961); *McGhee v. Walsh,* 249 Mo. 266, 155 S.W. 445, 452 (1913). The trial court ruled City action arbitrary, not subject to debate and in favor of the Landowners who carried the burden. *Collins v. Jaicks,* 279 Mo. 404, 214 S.W. 391 (Mo. banc 1919).

■ A. The City's allegation under Point I, Part A that the five abuses were not supported by the evidence will now be addressed with the caption numbers corresponding to those in the memorandum decision.

1) Change in project length without hearing.

In the original council action (CB 59–72 February 1972), followed by a public hearing, this project went north to the city limits. Approximately one year later, in February 1973, in Ordinance 5969 the total length of the project was shortened. The north boundary became a point 20 feet north of Grace Ellen Drive. This change was made without a public hearing. The record does not indicate how much of Oakland Gravel was taken out by this action. Standing alone this action would not be so egregious, but with the length of the project being shortened, and the deleting of a bridge thereby, it would lead to a conclusion of a lower total cost for the project rather than a greater end charge. Even though the original project had been accompanied by public hearing, the change in size a year later, without hearing, coupled with the long and bombastic unfolding of this project, leads to a denial of this point for the City. Even after the project had been abandoned and the contractor released from the 1973 contract, the only hearing then held was in April 1975 concerning raising the cost to $18.60 a foot.

2) Cost apportioned differently—no showing as to determination of costs.

Here the City complains of surprise asserting this was not "a litigated issue at trial." It then refers to numerous pages in the transcript for explanation of why there were variations in the tax bills. The explanations by the City of the differences were traced to either the existing City policy of affording relief to corner and through lots, or, because of activities of the Special Assessment Board. No matter how the city argues, the result was that the rates on tax bills for *this* project varied from $18.23 a foot down to $10.23. The City now states the Landowners had the burden of proving the reasons for the differences. With the factual backdrop of this entire case the best that can be said is the City Council had little or no idea of how the amount of tax bills were computed. At trial the landowner's evidence amply demonstrated that the city had no rational basis for the differentials and that the city either did not or could not show that it in fact had some reasonable explanation for the different charges. To expect an affected taxpayer to figure out what the City could not explain would be unfair. This finding is obviously linked to the third abuse; that portions of the costs were arrived at by Public Works Department, and to the 5th and most telling finding that the increased cost to the Landowners was as a result of their use of the courts. The Landowner's evidence of lower charges for adjacent projects completed at about the same time, and a City Resolution in 1976 providing for a maximum bill of $16 makes for further support for this finding and the trial court's result.

3) The determination of costs or share of a 32-foot wide street was made administratively.

The City's contention that it did not have a chance to litigate this issue is totally unfounded. Several city witnesses were questioned on direct and then cross-examined as to how the cost of a 32-foot wide street was determined in this case. The record is devoid of any reasonable explanation on this issue. Any scheme or plan in figuring the cost of making a 32-foot wide street out of Oakland Gravel was not brought to light. The individual parcel charges were made by the Public Works Department and, most likely, by the Di-

rector, Mr. Beck. Never substantiated were the reasons for increasing the first estimate in 1972 of $13.70 a foot to the second estimate of $18.60 in 1975 nor the final billed cost of $18.23 per front foot. Beck testified that due to the Arab oil embargo and a drastic increase in the price of petroleum the costs of the project went up substantially between 1972 and June of 1975 when the work actually commenced. He acknowledged on direct examination the variations in amounts billed on other projects in the area. The only explanation for higher costs here was the policy of relief for corner and through lot owners and because of action of the Special Assessment Board. It should be noted that none of the Landowner-plaintiffs in this case ever got any relief from the Board or the Council. Most of the Landowners either did not qualify to be heard by the Board or were denied a chance for such a dispensation by the Council. If little was gained on the subject of costs from the Public Works Department, less came from the former Mayor and Councilmen who testified for the City.

The fact that the Council approved the engineer's final report does not fill in the missing information. The figures given the Council were rooted in no discernable proration of expenses. The Council merely rubber stamped figures that bore no relation to any reasonable criteria. *See City of Sedalia v. Donohue,* 190 Mo. 407, 89 S.W. 386, 390 (1905); *Clay v. City of St. Louis,* 495 S.W.2d 672, 675 (Mo.App.1973). Nothing here implies that in every such case a council must be well-acquainted with all computations made by staff—but a council should be prepared to justify bills to its citizens at higher rates than for comparable projects. The City Council made no reasonable judgment as to costs to be billed to the Landowners. The citizen taxpayers had no relief, other than through the courts to seek redress for these bills since the Board, during the short time of its existence, gave no relief. After the Board's demise the $16.00 maximum figure appears to have been adopted by the City as a means of avoiding the ascertainment of what it considered the

Landowners fair share of a 32-foot wide street.

As is discussed elsewhere, the City's "basic street policy" is just that, a policy. No ordinance establishing this policy has been specifically adopted. Just because the City has a "major thoroughfare plan" that provides for 32 foot wide streets is here insufficient to rule out the aspect of unreasonableness as to these Landowners.

4) The right of appeal to the Special Board was given to some and denied others.

A brief chronology of the short and tempestuous history of the Board is as follows:

March 1975—It was given birth by the Council. Standing to appeal was given to those who had a tax bill more than ⅓ of the assessed value of their property. If not given an automatic right a Landowner could protest to the Council and the Council might grant relief if the tax bill exceeded the special benefits. The Board after hearing the Landowners' case could recommend to the Council a reduction. Of the 23 Landowners here involved 7 had the automatic right to appeal to the Board—of the rest 4 or 5 went to the Council for permission to go to the Board. No Landowner in this case ever got any relief.

November 1975—an injunction was entered against further Board activities. It was issued in response to the petition filed in this case.

July 19, 1976—the Council citing the expense involved, the difficulty in arriving at assessments without expert testimony and the treating of owners differently on rights of appeal because assessments had not been equalized, abolished the Board. The Council adopted a figure of $16.00 to be the top amount to be billed per foot. It kept in effect Ordinance 14.560 which provided for 60% charges on corner lots and 70% for through lots.

The trial court felt that assessed valuation had no relationship to special benefits, nor was there any apportionment of special to general benefits and the entire process denied many the right to relief. Also, anyone who had a corner or through lot could

not get relief for their bill being too high if they also asked for relief for being on a corner or through lot.

It is against this finding of abuse the City directs its most vituperative attack. Only those matters about the Board the City does not dispute elsewhere in its brief will be addressed here.

The City says the court "seized upon" the issue of the Board "to throw out the entire tax bill system of Columbia . . . ." This is not true. The fiasco of the Board is but one component of showing the City never made any consideration of special benefits in levying these tax bills; this coupled with unequal treatment and no special benefits to those being charged typify why *this* project's billing was enjoined.

The City makes the interesting argument that since these Landowners have judicially attacked the concept of the Board it is unfair, after its abolishment, for them to complain about it. This argument lacks any merit. Also without merit is the City's continuing argument that this issue was not litigated. The record negates this argument.

The City's contention of the front foot assessment scheme where the City pays for all charges over the cost a 32 foot wide street plus additional costs of site preparation, etc., which it describes as an "extremely intelligent" combination of "equity and practicality", as being put in jeopardy by the ruling in this case is unwarranted.

The City also says the Board was not that important of an issue since it could only make a recommendation to the Council. The Council would not hear or take any action on these Landowners. When the Council was debating the death of the Board, long after issuance of an injunction, one of the Councilmen said that without the Board aggrieved Landowners could use the courts. So, by setting up an appeals procedure that only a few could use, based upon matters other than benefits, which granted no Landowner here involved any relief, the City gave the Landowners no choice other than to use the courts, at the same time it finally contends its actions were beyond

judicial review anyway. This position is unreasonable, and arbitrary.

Finally, the City says the fact that no one got relief from the appeal process doesn't prove it was unjust, noting: 1) a person can't attack the validity of something and then retain the fruits thereof, 2) no Landowner had standing on this issue, 3) while the "appeals project was probably too ambitious or idealistic to be practical", it was not shown to be illegal, 4) despite the "herculean effort" by the Council the process was not a flagrant abuse, 5) the whole issue is moot because of the temporary injunction and the repealer by the Council, and 6) the point was not properly preserved. These points are also denied.

5) The resolution raising the cost referring to delays due to litigation.

This last abuse, most persuasive to Judge Conley, was of the City's raising the estimated cost of the project and the cost to Landowners to $18.60 per foot by resolution in April 1975 and stating:

"Whereas, because of delays due to litigation instituted by property owners abutting the street improvement, the street construction project has not yet begun, the street construction contract has lapsed, and the street construction project must now be rebid;"

The City's continuing argument that this was not pleaded and not a "litigated issue" and that it did not defend itself, appears again. This argument is totally belied by the record. Several City witnesses on direct examination attempted to explain why this language was in CB 128–75. The Landowners pleaded arbitrary City action. The Landowners introduced the Ordinance into evidence. After testimony was admitted explaining the background of negotiations on acquisition of the right-of-way, the City had several witnesses, including the City Manager, attempt to explain the price differential and the reasons for and meaning of the language in question. Evidence was introduced in the Landowners' case which leads to the conclusion the City was "getting even". This evidence was within

the pleadings. In any event Rule 55.33(b)[4] would permit this evidence by the Landowners. *See Pike v. Pike,* 609 S.W.2d 397, 400 (Mo. banc 1980), where the court held:

"When variance occurs without objection between pleadings and proof, such variance, especially in court tried cases, shall be considered immaterial and the pleadings deemed amended to conform to the proof."

The City's lawyer, Mr. Lewis, attempted mightily to counteract the cumulative result of this evidence when he asked such questions of City Manager Novak; "What I am getting at is when you said due to litigation instituted by the property owners, you were not referring to the condemnation suits to acquire right of way", and, "Were you referring . . . to these writs of prohibition?" The City prepared for and defended against this point, its explanation just didn't impress the trial court, and it remains, the Landowners were charged more than others located near or next to this project at the same or later times. The City's statement as to rising material costs should have been reflected similarly as to all projects built within this time span. As the Landowners' state: " . . . the cost of a 32 foot residential street in 1975 had to be the same for everyone, but the defendant charged everyone a different price . . ." Also remaining unexplained was the City's effort by Ordinance in June 1976 to set a maximum $16.00 per front foot charge that could be assessed against abutting property owners for any street improvements.

The City admits the writs were the suits that caused "the loss of the 1974 season". This explanation must be viewed in light of the facts:

February 1972—Original ordinance

March 1972—Public works met with Landowners and told them $1 will be paid for their land and if there are land acquisition costs they would be tax billed back to the Landowners

May 1972—Landowners balked at $1 offers

February 1973—Call for bids; estimated costs $13.70 per foot

April 1973—Condemnation ordinance repealed

June 1973—Condemnation cases filed on the 18 Landowners who had not conveyed land

July 1973—Hearings on separate suits filed by Landowners claiming City offers not in good faith

October 1973—Condemnation cases dismissed by City—appraiser hired negotiations begin with Landowners

April 1974—Condemnation cases filed after appraisal's received

June—September 1974—Writs filed by Landowners—denied by September 10 by Supreme Court

January 1975—Last of Condemnation suits filed

March 1975—The original contractor released from March 1973 contract

April 1975—Front foot cost estimate raised by Ordinance to $18.60

June 1975—New contract for the project; this suit filed

Summer 1975—Construction

January 1976—City accepts project

June 1976—Vandiver project, a 40 foot street, tax bills with a maximum of $13.70

July 1976—$16.00 maximum amount set by Ordinance for future tax bills for 32 foot wide street

---

4. Rule 55.33(b) reads as follows:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

October 1976—Tax bills issued here (from $10.93 to $18.23) and enjoined

December 1976—South Oakland Gravel project with maximum of $13.75

July 1977—Wilkes project, a 32 foot street $16.00 maximum

The City's explanation of the writs causing the increase, even if true, would not stand up because the City's appraisals were not done until January 1975, when the last of the condemnation suits were filed. The City contends the construction season was only during the summer, and if so, neither the 1973 nor the 1974 season were lost because of the "writs".

Because other projects were being done at a lesser cost it becomes obvious the City was getting even with those persons for not conveying their land for $1. Again, the City has given no justification for the higher costs on Oakland Gravel. Higher charges had to have been levied because these citizens remonstrated against the project, whereas others did not.

The City of Columbia after carefully explaining the meaning of this clause in the Ordinance, then says the language was really irrelevant. The clause however is untrue and despite the City's contention it was accurate, was apparently put in the Ordinance as a justification. Whether the clause was or was not in the Ordinance is of no great significance. If it had not been there the facts would still lead to the result the trial court reached—but the inclusion of the language just points out very graphically what could reasonably be inferred from the City's actions.

After contending throughout its brief that the issue of benefits is not properly reviewable by the courts, that benefits are presumed because of the legislative determination, the City in this point says this finding is not related to benefits so it should not be considered. This is rejected. Alternatively, the City states that even if the finding was correct it does not amount to a "flagrant" abuse. As covered in other portions of the opinion, this argument is denied.

The City's final reasoning is that it would have no reason to cause a delay since delay also increased its share, so there could be no sinister action imputed to the City. This deduction is faulty since it flies in the face of higher costs to these taxpayers than to others similarly situated.

B. The matters raised on appeal by the City in this sub-section of Point I, and those captioned "C" and "D" comprise its fall-back position. In the prior portion of Point I it contends basically there should be no judicial review of City actions, or that the 5 abuses listed by the trial judge were not properly before the trier of fact or were unsupported by the evidence. Parts "B", "C" and "D" state in essence that even if proved the 5 abuses are inconsequential and should not afford the Landowners the relief granted.

The City's sub-point "B" calls to the court's attention the "incidental" nature of the 5 abuses in that they had nothing to do with the actual "allocating [of] general and special benefits." The City relies on the following language from *Kansas City Southern v. Rd. District, supra,* 266 U.S. at 386–87, 45 S.Ct. at 139–40:

> "And only where there is manifest and unreasonable discrimination in fixing the benefits which the several parcels will receive can the legislative determination be said to contravene the equal protection clause of that amendment."

As will be noted *infra* the City either didn't consider or determine any special benefits to be allocated the abutting Landowners. The cost here of the mythical 32' wide street (abuse 3) was at best done administratively and without knowledge of or determination by the council. The City can get no benefit of a presumption of correctness of legislative action if the deliberative body, the City Council, never considered the matter of benefits, nor had any idea of costs to be apportioned. As in abuse 2 Judge Conley found that different people in this same project had different costs charged to them without any adequate explanation by the City. As further indicating a disregard for determination of special

benefits, was abuse 4, the City's determination of who could appeal to the Special Assessment Board. Eligibility for relief was based on the ratio of the amount of the tax bill to assessed valuation, there being no reference to benefits. Add to these items the action taken in April 1975 in CB 128–75 where the front foot charge was raised to $18.60 (from the original charge of $13.70) with the explanation of increased cost due to "litigation", demonstrates the City was merely punishing the Landowners for opposing the 1973 condemnation suits wherein the City attempted to get the land for $1.00. The City's justification for higher costs on this project as being due to delays, is shorn of credibility by the evidence of lower costs taxed to others in the general vicinity in Columbia for similar projects completed at about the same time as the one at bar.

C. The City characterizes the 5 abuses as "petty" and any City irregularities not being "palpably arbitrary" as described in *Kansas City Southern, supra* at 386, 45 S.Ct. at 139. Suffice it to say that the City Council during this prolonged mis-adventure neither thought of nor determined any special benefits. The findings of arbitrary action and abuse by the trial court are correct. If action by the public entity here were not found to be arbitrary, or a plain abuse of power, as described in *Kansas City Southern,* it would be hard to imagine a factual situation ever fitting that description.

D. The City contends the Landowners were not prejudiced in any way by the "purported abuses, but if this court did find them 'real' it should 'correct the same without the drastic remedy of voiding all the . . . tax bills . . .'". It would have this court fix some amount for the Landowners to pay or now let the City recompute the tax bills. The City cites no authority for a Missouri appellate court to compute tax bills on a project where no benefits were found. Where there are no benefits courts have voided tax bills rendered and enjoined issuance of any others on the project. *De Fraties, supra,* at 385. Even if there were authority here to "give the City something"

this court would decline to do so. After spending a good portion of its 100 page brief complaining of too much judicial intervention in these types of matters, and pointing out countless times the severe limitations on judicial review, it is most incongruous the City would alternatively here support judicial help and guidance for the Council.

The City now wants a decision as to what to do with landowners who were not parties to this suit. This request is untimely, not preserved and will not here be ruled upon. The City neither made an issue of nor presented any evidence on the contingencies it now presents on appeal. The judgment appealed from affects only the individual parties to this suit.

## II.

■ In this point of error the City takes issue with the findings as generally contained in number 19 of the memorandum decision. There the trial judge found Ordinance 14.560 allowed the City to charge abutting Landowners along the *improved* distance to be charged, while the City Charter in Section 71, Article IX (as explained in finding 16) limits tax bills to *benefited* properties. (Emphasis added). The inconsistency noted by the court is that the Ordinance makes no provision for consideration nor determination of special benefits to the abutting property owners as required by the charter and case law. A special benefit is one that flows to the property from the project over and above any general benefit to the public as a whole. 14 McQuillin, Law Of Municipal Corporations, Sec. 38.32, p. 121 (3rd Ed.1970), *Accord: City of St. Louis v. Pope,* 344 Mo. 479, 126 S.W.2d 1201, 1214 (1939). The implication found by the trial court is persuasive—even if special benefits are to be judicially presumed because of legislative action, if special benefits weren't even considered in the legislative process and none are shown by evidence, then the action of assessment must be held to be arbitrary, unreasonable and confiscatory. Even in *French v. Barber Asphalt Paving Co.,* 181 U.S. 324, 21 S.Ct. 625, 45 L.Ed. 879

(1901) and *Spencer v. Merchant,* 125 U.S. 345, 8 S.Ct. 921, 31 L.Ed. 763 (1888) relied upon by the City, the Supreme Court recognized the necessity of finding special benefits. In *Spencer* at page 353, 8 S.Ct. at page 925 it is stated there was a specific finding by the state legislature of costs and benefits of the project. Here there is the uncodified rule of the Landowner owing a 32′ wide street and at most an *ex post facto* determination by the Public Works Department of that cost. Added justification for the trial court's finding is that CB 59–75 which amended 14.560 in 1975 (see finding 20), gave the right to appeal to the Special Board to Landowners based on a minimum ratio of ⅓ between their tax bill and the *assessed* valuation of their land. Also, anyone who had a corner or through lot would waive any reduction on their tax bill if they did file an appeal. The Ordinance made no provision for determination or finding of special benefits.

■ The City takes this finding as an indictment of its policy of assessing or tax billing on a front foot basis. The City misinterprets what the decision says. The inconsistency is that the Ordinance makes no mention of there being a benefit conferred to the abutting Landowners. The City may not assess on a front foot basis without any right of the Landowner to show the assessment exceeds benefits. *Norwood, supra,* 172 U.S. at 270, 19 S.Ct. at 187. *See McQuillan, supra,* Section 38.31. For the City to tax bill there must be a special benefit to the abutting Landowner. Where the burden of the cost of the improvement is imposed, as here, without regard to or in consideration of special benefits conferred upon the tracts to be taxed, those charges cannot be upheld. *Hesse-Rix Co. v. Krug,* 6 S.W.2d 570, 575 (Mo.1928). *See also McGhee v. Walsh,* 249 Mo. 266, 155 S.W. 445, 447 (Mo. banc 1913). The Council did not consider special benefits: none resulted from this project. Nothing here at-

tacks the well-established method of assessing benefitted abutting properties on a front foot basis. There was nothing in the decision-making process designed to produce a correct result or utilize available expertise, *Matter of Village of Burnsville Assessments,* 287 N.W.2d 375, 377 (Minn. 1979).

### III.

For its third point the City contends the trial court erred and committed a gross abuse of discretion by finding the Landowners received no benefit from this project. The City in its well-organized presentation on the issue of benefits sets out reasons and examples of the purported errors at the trial level which this opinion will attempt to track in appropriate sub-sections. Although raised here and elsewhere, the allegation of *res judicata* and waiver will be dealt with in point VI.

■ A. The City says the court used an incorrect legal principle, *i.e.* benefits based on *present* use of the property, when it should have examined the highest and best use to which the land *could* be put. The City is correct in stating the rule used to measure whether benefits derive from the project—it basically is whether benefits from the project would flow to the highest and best use for which the property could reasonably be utilized as opposed to direct and immediate benefits for present use. *Lakewood Park, supra,* at 246–47. The rule makes sense in that if the property abutting the reconstructed road or new sewer line is underutilized or vacant, the property will get a benefit when put to its best potential, so benefits, though not immediate, are present and should be borne by the extent of special benefits from the project. This rule is subject to limitation, however, that if the benefit is too speculative and will only occur at too remote or lengthy period of time from the project, then no assessment can be presently made.[5] The

---

5. In a Minnesota case, *Matter of Village of Burnsville Assessments,* 287 N.W.2d 375 (Minn.1979), involving a sewer project, the court held an argument as to future use to be

too speculative to justify assessment where the benefits may not accrue for fifteen to twenty years if at all. *See also, Page v. City of Lockhart,* 397 S.W.2d 113 (Tex.Civ.App.1965) in

expected use must be "within the reasonable future", *Page, supra,* and to be assessed as a benefit, the consideration of future uses must be "reasonably anticipated." *Mulford v. City of Iowa Falls,* 221 N.W.2d 261, 266 (Iowa 1974).

■ That the trial court used the proper method of determination of benefits and did not limit consideration to just the time of this reconstruction project, is evidenced by the following language in its decision. "... One determines the benefit or detriment as to the land itself when utilized for its highest and best use.

\* \* \* \* \* \*

Both parties agree that the highest and best use of these properties would be for residential purposes. The evidence differed markedly however, on how quickly these properties would achieve their full potential."

As stated earlier, the lots on Oakland Gravel are large, with many of the homes set a great way back from the street. On the issue of usage of the street the Landowners' evidence was that present use of Oakland Gravel by the Landowners amounted to 5–10% of the traffic. The City's expert gave figures of 7–15%. To fully sub-divide, the Landowners' expert said, takes sixteen to nineteen years. This amount of time for full development, when, under the City's evidence, residents would then amount for 50% of the traffic, is much too remote and too speculative to justify any benefit for which the City could presently assess. The trial court was correct in finding no benefit in the foreseeable future.

One of the tracts belonging to a plaintiff in this suit is a 25.5 acre parcel containing one of the oldest homes in Columbia. This historical landmark, "Confederate Hills", according to the City's expert, could be sub-divided into 12 lots to reach its highest and best use. This despoilment and expense to effectuate the City's master plan by having a large antebellum home on a hill

overlooking 12 tract homes would extend the rule as to future use to "a logical absurdity". *Leonard Capaldi Contracting Co., Inc. v. City of Fraser,* 70 Mich.App. 227, 245 N.W.2d 575, 577 (1976).

*Lakewood* is distinguished from the case at bar in that it involved construction of a sewer for a district in which a cemetery was located. In the *Lakewood* case there was no finding that the assessment was made in an arbitrary or capricious manner, and the court noted the potential health hazards of open sewers as compared with an underground sanitary sewer system. The court noted that such an improvement clearly constitutes a benefit to all property being served by it, and the entire cost of the project was tax billed to the properties being served. In the instant case there are no such clear benefits and no uniform rate was charged, and in allocating between special and general benefits there was no effort to find what special benefits could possibly accrue to the abutting property. Had the City made proper inquiry and investigation into evidence such as it raised at trial, *prior to fixing the tax bills,* then its discretion might have been upheld by the trial court. The City objected to any evidence of benefits on the ground, "... the matter is concluded by legislative discretion vested in the city council ... acting within its legislative discretion and is not subject to review by court and evidentiary hearing after the fact ...." This view by the City would all but destroy any form of judicial review. Although scope of review of these cases is limited—there is still a chance for court review.

■ B. The City says the trial court in its finding of no benefits erred by ignoring benefits of the project such as, sidewalks, access from driveways to the street, improved sight lines, relief from maintenance, better underpinning and easier snow removal. The court did note as benefits of the project the fact that the Landowners would no longer have to pay maintenance

---

which the court held as a matter of law that projected use of farm land for other than farm purposes some eight to ten years in the future

is too remote and too speculative to find benefits and did not support a paving assessment against abutting owners.

costs, sight lines had been improved and a sidewalk constructed, but, when set against the detriments caused (increased traffic at higher speeds, more noise, change in the character of traffic, difficulty in access and the aesthetic damage done to the neighborhood), there was no net benefit, but a detriment as a result of reconstruction. The Landowners got a smoother wider street, a benefit; it cost them disparate and higher amounts than for similar projects, and at the expense of the pillage of their carefully maintained neighborhood, detriments—the net overall result was a detriment caused by this project.

C. The City says the court's findings of increased noise, traffic and speed after reconstruction were not supported by the evidence and there was no showing as to what caused these increases. Despite the contradictory nature of this argument, evidence was presented supporting the findings on these issues. There was evidence that after the project was completed traffic went up 21% in 1976 and truck traffic went up 37% in 1977. The City says the Landowners didn't show that any of the increases were due to the project, but suggests "natural growth" may have been responsible. From the evidence appearing in the transcript it seems clear the increases in traffic occurred because of the reconstruction and because of the City's thoroughfare plan to make Oakland Gravel a part of a major roadway system to connect the northeast part of Columbia with the downtown. In *Village of Edina v. Joseph, supra,* relied upon by the City for this point, the evidence showed other new generators of traffic such as a new shopping center. The landowners' admitted to a population growth in the area designated as rapidly mushrooming and to a significant increase in construction since the improvement. *Id.* 119 N.W.2d at 813–14. There were no such comparable facts here. There was a subdivision being built in this

case, but apparently not comparable in scope or effect to that present in *Village of Edina.*[6]

D. The City of Columbia pounces upon this statement to show the trial court's misunderstanding of how to figure benefits: "A thirty-two foot residential street, even on Oakland Road, can be shown to create special benefits for the abutting property. It does not necessarily follow that a wider street of the 'collector' variety will provide a greater benefit." This reference by Judge Conley was probably in response to the City's rule that all Landowners' owed a 32 foot wide street but that it was reconstructing Oakland Gravel to a 38 foot wide street and the City would pay the extra cost. The City interprets this statement as implying the City could have built and tax billed for a 32 foot wide street since there was a benefit, but, the extra 6 feet turned the whole project into a detriment for which no tax bills could issue.

Even if the City's interpretation of this quoted statement were correct, it would not help the City's cause. The actual widths of roads are not in and of themselves determinative. In the last analysis it must be determined whether there were special benefits to the property from the project—it was determined here to the contrary. There was no magic to the City's policy of a 32 foot wide street. To make such a fiat, without further showing of special benefits, shows the arbitrary nature city action resulting in this "policy". If the City interpretation is correct, the court's statement was superfluous to the opinion. At most, the language in the decision gives rise to the interpretation that the City could, or might be able to show special benefits from a 32' wide Oakland Gravel Road; it didn't do that and certainly even a wider road would not necessarily make up the lacking benefits. This point is also denied.

6. *Village of Edina,* is said by the City to be almost factually identical with this case. In Point I where it was noted that the Landowners had no right to appeal or get relief on their tax bills, due to the criteria set up for the Appeals Board, in *Village of Edina* the court mentions

"study and deliberation by the village council in evaluating the benefits", *supra,* 119 N.W.2d at 819, and abutting owners were given the opportunity to be heard on benefits before court action commenced.

E. Apparently many of the traffic generators, schools, parks, etc., preceded by some time the reconstruction of Oakland Gravel. There was no evidence Oakland Gravel was clogged by traffic prior to the 1975 reconstruction. The credible evidence is that after reconstruction traffic increased on this street. The City harks back to no showing of causation as to increased traffic and relies on *Village of Edina, supra,* to tip the scales in its favor.

In *Village of Edina* the landowners' own witness conceded that reasonable men might reach a conclusion on special benefits—there is nothing like that admission here. There the project spawned development which the court viewed as a favorable sign on the issue of improvements. There was no evidence here of the project spawning subdivision growth within the foreseeable future, and any such activity would, as pointed out by the trial court, ruin the aesthetics of the neighborhood.

IV.

For its fourth point the City itemizes the reasons why the case of *De Fraties, supra,* relied upon by the trial court, is not controlling nor applicable to the case at bar. A brief explanation of *De Fraties* as it particularly bears upon the issue of special benefits is as follows. Kansas City sought to widen to four lanes a dead-end residential street, "Hardesty", between then U.S. Highway 50 and another trafficway. The grade of Hardesty was to be changed to make Manchester Trafficway. The city charter had a "trafficways commission" to study the needs of providing required traffic arteries and a section that provided for a method of "remonstrance" by property owners. If a majority of residential landowners filed and did not withdraw their remonstrance the City could not proceed to change the grade until a majority of voters approved the project at a city wide election. The city charter also provided that remonstrances could not limit the power of the City Council to change the grade of a roadway or trafficway. The Charter also provided for notices of changes in grade to be published and for hearings to be held on those projects. No sidewalks were included. The project was designed to carry increased traffic of larger and heavier vehicles. The Supreme Court held the hearings provided for were not timely held. At hearings the city engineer did not give accurate information to the landowners about their ability to file remonstrances. The court held the provision of the charter which took away the right to file a remonstrance to be a denial of due process. More importantly the court held there was "... nothing in the record ... to show ... changing this dead-end residential street to a wider trafficway ... bringing greatly increased traffic of larger, heavier vehicles, could constitute a benefit for which these residential property owners should be required to pay." *Id.* at 387. On rehearing the court noted the construction of a trafficway could "... only be a detriment and not a benefit ...", and the landowners should "... not be required to pay assessments ... because they received no benefits ... since it is a detriment to their property ..." *Id.* at 388. The City was therefore restrained from levying special benefit assessments against the landowners. The assessment was voided so as not to allow a taking without due process. The *De Fraties* court relied upon the Michigan cases of *Brill v. City of Grand Rapids,* 383 Mich. 216, 174 N.W.2d 832 (1970) and *Fluckey v. City of Plymouth,* 358 Mich. 447, 100 N.W.2d 486 (Mich.1960). In both these cases narrow residential streets were widened considerably to be used as facilitators of greater traffic. The Michigan Supreme Court found detriments not benefits to the adjoining landowners and the local governments were not allowed to enforce special assessments.[7]

---

7. In *Fluckey* a 22 foot wide blacktop was converted to 48 foot concrete reinforced pavement capable of handling large trucks for a plant close to the village. The widening from 2 to 4 lanes and a greater volume of traffic was not a

benefit to the adjoining homeowners. In *Brill* the Court struck down a project that changed a 20 foot wide country black-top road with dirt shoulders with roadside drainage ditches to a 44 foot wide connector with underground

In *Lakewood, supra,* the Missouri Supreme Court reaffirmed the result of *De Fraties* based upon its facts and defined the scope of review of these types of cases by stating there is a presumption the legislative body has conferred a benefit because of its project and there is a presumption the ordinance is reasonable. The burden of establishing the contrary is on the party objecting to the project. In essence the landowners must show the courts that there was no "reasonable theory which justified a finding of special benefits." *Id.* at 248. The decision of the board of a sewer district in *Lakewood* was held to be conclusive in the courts "in the absence of fraud or unless a real and arbitrary abuse of discretion readily appears ..." *Id.* at 246. This again is the rational basis test referred to in point I. Note, 41 Mo.L.Rev., *supra. See also,* Comment, Special Assessments for Road Improvement Projects in Michigan—What Standard of Court Review? 20 Wayne L.Rev. 1073, 1081, 1086 (1974). The end result is there is a point beyond which a legislative body may not go, even though its actions are presumed correct. This occurs when its action has been shown to the courts by the landowners that governmental action was arbitrary, fraudulent, unreasonable, oppressive, or wholly unwarranted. Note, Mo.L.Rev., *supra* at 460.

 A. In its first sub-point under point IV the City says the standard of judicial review in Missouri requires that objectors must carry the burden of showing the action was an "arbitrary abuse of discretion". With this statement the court agrees; there must be a showing of arbitrariness in the finding of and levying against special benefits to adjoining Landowners. The honing of the concept of scope of review in *Lakewood* does not detract from *De Fraties,* which is factually similar to this case. If there are no net benefits, or if the detriments are so overwhelmingly evident, then the presumption of benefits and reasonableness is rebutted, and the courts may find the public entity's action arbitrary. If "arbitrary" or "unreasonable" are not determinations the courts can make from the evidence, then landowners could never get any relief once the legislative body had acted. The City here would exclude any factual examinations by the courts and would make the presumption in favor of the City irrebutable. To adopt that scope of review would, as stated previously, never afford relief—it would eradicate "arbitrary" as a determinative and make the outcome of every case favorable to the governmental entity, making judicial review a needless and useless exercise.[8]

Although the scope of review of *Lakewood, supra,* governs judicial review, the facts of *De Fraties* and those here are quite similar. The limited scope of judicial review does not require the facts to be ignored. The matters found by the trial judge to be arbitrary are indeed evidence of arbitrary action by the City—the examina-

---

drainage and curbs. The court said it would "stretch credulity" to find a benefit to residential property of this "major street" that made the street a "less safe place to live." As in *Fluckey,* a peaceful residential neighborhood was involved. In the Michigan Court of Appeals case of *Axtell v. City of Portage,* 32 Mich. App. 491, 189 N.W.2d 99 (1971), the court ruled in favor of the City where the street was changed from 2 to 4 lanes but was not transformed into a major artery. Next, in *Tack v. City of Roseville,* 67 Mich.App. 34, 239 N.W.2d 752 (1976) a 2 lane 22 feet wide road in good condition was changed to a 5 lane 58 foot wide road to take care of a bottleneck in traffic. The court found a general benefit to the motoring public; there was no reasonable basis for the local officials to find a special benefit to those landowners. In *Production Tool Supply Co. v. City of Roseville,* 74 Mich.App. 34, 253 N.W.2d

350 a gravel road was changed to a paved one with curbs and gutters. No showing of special benefit was found to the plaintiff-owner of business property. In *Johnson v. City of Inkster,* 401 Mich. 263, 258 N.W.2d 24 (1977), a primary connector was widened to five lanes to "facilitate the passage of traffic through the assessment district[.]" Any special benefits were minimal and no special benefits came to those in the district where it was shown this was part of the city's plan to use the roadway as a major thoroughfare.

8. Where legislative action in violation of a common right imposes a burden on a citizen without a corresponding benefit "the courts will interfere for his protection. *Heman v. Allen,* 156 Mo. 534 at 561, 57 S.W. 559 (1900).

tion of benefits (sidewalks, no continued maintenance charges and improved site lines for traffic) are far outweighed by the detriments (more and faster traffic, noise, aesthetic damage and difficulty of accessing Oakland).

B. The City notes that unlike *De Fraties,* in this case there was evidence of benefits to the Landowners. Evidence of benefits was as follows: (1) a real estate broker called as a City witness said a wider street was a safer street; (2) a sidewalk added safety for pedestrians; (3) easier access from driveways; (4) better drainage system provided; (5) other testimony estimated benefits after the project ranging from $850 to $20,350; (6) the City Manager's testimony that a bridge was widened, maintenance charges to Landowners reduced and aesthetics improved; (7) an ex-councilman said guests could park on streets; entrance ramps put on grade with the road, a reduction of standing water was effectuated and snow removal would be easier; (8) the City Engineer said the road would be safer for emergency vehicles and rock from driveways would not get on the roadway as easily; (9) a former Mayor and Councilman said the new roadway would have a better underpinning. Add to this evidence, "every day common sense", says the City, and you have a different situation from *De Fraties* where there was no evidence of benefit. The judge was not required to believe the evidence presented by the City. Although judicial review in special assessment cases is limited, and there exists a presumption of benefits and that the City's action was correct, it does not follow that the trial court must take as true all that the City presents. Appellate review must still give due deference to the judge's ability to see and hear the witnesses and see how the evidence was presented. *Cf. Production Tool Supply Company v. Roseville, supra,* 253 N.W.2d Note 6, at 353. This contention is denied.

C. Columbia launches into ten subpoints within this sub-point in order to factually differentiate this case from *De Fra-ties.* These alleged differences are summarized as follows.

In *De Fraties* there was a change of grade and speed limits were in part increased. Here Oakland Gravel was not part of a major change, still had two moving lanes and the same speed limit, and was not previously a dead end street. True, Oakland Gravel was not transformed from a dead end street to a trafficway, but it was nearly doubled in width from a street serving a quiet neighborhood to a street serving a whole area of the town. The terms of art such as "collectors" and "arteries" can sometimes blend in their meaning and application. Using the common sense the City wishes applied, *De Fraties* landowners and the Landowners here did not ask for, did not want and did not wish to pay for a major change in the street they used. For the City to say that there still existed here only two lanes of traffic really begs the question. The Landowners got two parking lanes, which the evidence showed they didn't want and that nobody needed or ever used. To say this addition of two parking lanes conferred a benefit cannot here be sustained. The evidence showed the sidewalks were added because of the proximity of a school. Since the evidence showed the Landowners did not have children attending the school, special benefit to them is hard to find.

*De Fraties* landowners already presumably had an improved street (gutters, drainage, etc.) whereas these amenities were added here. Within the context of these facts the City, even bolstered by the presumption in its favor, cannot prevail. The testimony of the Landowners was, for example, that drainage was better before the City embarked upon its expensive construction.

The *De Fraties* court said there was no evidence of benefit. Here says the City there was "undisputed evidence . . . of improvements". The City's literal interpretation of "no evidence" of benefits in *De Fraties* misses the mark. That language implies a net balance of no benefit after weighing any benefits against detriments.

For example if a 20 foot street were widened to a 60 foot wide street and paved with gold there might be some benefit, but when viewed against the detriments might be of "no special benefit" to adjoining Landowners. The issue of benefits was hotly contested and the trier was not bound to believe all evidence favorable to the City.

The City says *De Fraties* "involved a straight tax bill", whereas here there was an allocation of general and special benefits under an ordinance. The importance of this alleged distinction is not understood.

In *De Fraties* there was no mention of condemnation or voluntary conveyances by the landowners. The City posits, "those issues were not involved or were not raised." The City makes much of the fact, covered in its Point VI, *infra*, that because some Landowners voluntarily conveyed, or were subject to condemnation for their land, they somehow could be estopped from maintaining a suit to halt the paying of assessments. Suffice it to say at this point, Kansas City in *De Fraties* had to get the land some way. The price of acquiring the land for a project is a far different issue from ascertaining whether a determination could reasonably be made that the finished project has conferred a special benefit. The following language on motion for rehearing in *De Fraties* bears upon this point. "Although property owners who have not made a claim for damages for change of grade may not now do so, we hold that they are not to be required to pay assessments for building this trafficway because they received no benefits from it since it is a detriment to their property for the reasons stated in our opinion." 521 S.W.2d at 388.

The City harks back to the fact in *De Fraties* there was an increase in the speed limit—here it remained at 30 m.p.h., "and any problem of speeding is one of *enforcement*." (Emphasis added). This distinction is meaningless. The City's cavalier treatment of drivers going faster on the reconstructed street further buttresses the conclusions reached by the trial court.

Next, the City states the street in *De Fraties* was converted from a "residential street" to a "trafficway" but Oakland Gravel road remained a "residential collector" after the project. As previously mentioned, the use of terms of art in denominating streets misses the true effect of the project on adjoining Landowners. After the project, whether the road was then called a cow path or an autobahn the Landowners in *De Fraties* and on Oakland Road had their street and their neighborhood changed—the amount of traffic was greatly increased and the City looked to them to pay all or part of the cost of reconstruction.

The *De Fraties* court in citing the 1970 Michigan case of *Brill v. City of Grand Rapids, supra,* noted it would be difficult and less safe for landowners to back onto the trafficway and would depress the value of the land. The City of Columbia here says residents of only six of the thirty-nine houses need back out (and now into a parking lane). How this establishes a benefit or lack of detriment is not apparent.

The City says the street conversion in *De Fraties* established "causation" for increased noise, car speed and traffic whereas here there was no showing that these changes did not result from "natural growth". Before the City's reconstruction this was a quiet neighborhood with a black top street averaging 20 feet in width. After the project the traffic, speeds, etc. increased. It seems incredulous to believe the "natural growth", and the widening of the street, just happened to coincide.

The City further notes that in *De Fraties* no sidewalks were involved, whereas here sidewalks were included. This factual difference, without explanation of its materiality by the City, implies that the Landowners would have had to pay the assessment in *De Fraties* if only sidewalks had been included. A reading of that opinion gives no such indication, and from the facts here, the inclusion of sidewalks does not resuscitate the City's case.

D. The City mentions again the point that the voluntary conveyances made pursuant to condemnation proceedings foreclose the Landowners from now raising the

issue of detriments. This point is again ruled against the City.

E. The City's final point is in actuality a restatement of one of its sub-points in Point III and "B" above. It is that the Landowners didn't prove "causation", *i.e.*, that increased traffic was generated from the project not from the general pattern of growth in the area, *i.e.*, parks, schools, airport and new developments. The City loses sight of the fact that to assess and levy on a "special benefit" there must be a showing the property indeed got some special benefit the rest of the public didn't get. Nothing is a benefit which doesn't enhance the value of the property. *See, McQuillan, supra,* Section 38.32, page 121. That 90% of the users of this reconstructed street were not from the area hardly implies a special benefit.

## V.

The City cites as error matters (A) through (R) and says the cumulative effect of these erroneous factual findings and legal applications show an abuse of discretion and the presence of bias. Those allegations not touched upon elsewhere in the opinion will here be treated individually.

A. The City claims the judge erred in referring to the land in question (1) as until recent times being of limited agricultural use and, (2) the size of the lots being larger than town tracts. The City says this shows the court incorrectly relied upon the present rather than the potential use of the land in determining benefits. The court's history of Oakland Gravel Road was extracted from the evidence. There is no error.

B. The City complains of the judge referring to Oakland Gravel as being in fact an "arterial" street instead of a "collector" as the testimony disclosed.[9] Whether the road in question should be put in one definitional category or another, or whether it was somewhere in between a "collector" or

"arterial" is of less consequence than the finding of special benefit to those tax billed. As the City notes from *In Re Oak Street,* 308 Mo. 494, 273 S.W. 105, (1925), the adjoining landowners are presumed to have received a benefit even if there are benefits city wide to the motoring public. But the court at page 109 conditions the foregoing statement on the fact that the ordinances in question conform to the city charter. Here, in addition to a lack of special benefits there is a further cloud from the City's improper delegation and figuring of the assessments.

C. The trial court's memorandum states that the reconstruction of Oakland Gravel will result in change in the character of traffic (it having more commercial vehicles using it). The City properly notes there was no testimony as to truck or commercial traffic before reconstruction and the expert witness for the Landowners made a count of only a 5% increase after the project. This factor probably should not have been included as a detriment. Its inclusion is not error, individually or "cumulatively", since Judge Conley correctly noted other detriments to the Landowners, including greater difficulty accessing Oakland, increased noise, increased traffic, and the despoiling of the landscape and character of the Landowners property occasioned by the reconstruction.

D. The memorandum states the road was improved to "black-top" in the early 1940's. In fact, as the Landowners agree, it was merely oiled or "seal-coated". This cost was borne by the Landowners. This assertion of error as to this recitation by the trial court as being "misleading" does not bear on the important and decisive aspects of this case.

E. The City takes issue with the memorandum's reference to, "Oakland Gravel was a 'semi-improved' road serving the immediate neighborhood *very adequately* as a

---

9. The smallest type of street, a "local," has two traffic lanes and one or two for parking, with the primary function of serving abutting property owners. In a "collector", the movement of traffic and service to abutting Landowners is of equal proportion. In an "arterial" which contains two or four lanes of traffic, "arterial", traffic movement is primary, access secondary. "Expressways" then "freeways" are the greatest traffic generators.

'residential street'. Columbia, however, grew and it became increasingly important for a traffic corridor to the north to be established in this general area" (Emphasis added). It says that finding is questionable. The finding is totally accurate. The City then says, "it is wholly immaterial legally, and cites *Marbury v. City of Farmington,* 5 S.W.2d 677 (Mo.App.1928). This assertion is incorrect and *Marbury* is inapposite to the facts here. In *Marbury* it was undisputed the street needed repair, the landowners wanted to enjoin the project to require use of cheaper methods and materials. The decision there was made to use longer lasting construction materials to keep pace with more cars being on the road in the 1928 era. In this case the City wanted to provide a way for people in the northeast area of Columbia to get downtown, to schools and to parks. The people living on Oakland Gravel did not ask for nor agree to the reconstruction of the road into a 38 foot wide street. They successfully bore the burden of proving no special benefit to them because of the project. As a premise for such a lack of benefit it is most relevant, and in fact essential, to determine if the street, prior to reconstruction, was serving the Landowners adequately. If so, then a balancing of benefits and detriments was necessary to determine whether the City's action was arbitrary.

F. The defendant City denominates erroneous the Memorandum Decision's statement that the costs or pro rata share of a 32 foot wide street were determined administratively by the Public Works Department of Columbia. Judge Conley cited this as one of five examples of how the City's actions were arbitrary and capricious. The City contends the evidence showed the Public Works Department activity was merely an aid to the City Council which then examined the data and made its decision. The testimony of the City Manager and one of the Councilmen provide ample evidence to support the trial court's finding and conclusion that the Council abdicated responsibility in any preparation, direction or oversight in the calculation of the $18.60 estimate or the actual per foot charge of $18.23 for each

owner's share of the costs. The Council was merely presented with the figures by Beck the City Engineer; it asked for no backup as to how those charges were ascertained. City Manager Novak in his deposition said the $18.60 figure was a calculation by Public Works and the Council did not play any part in that procedure.

G. After noting the City's policy that every Landowner "owed the general public a 32 foot street", the memorandum stated that had the City just widened the street in question from 20 to 32 feet and tax billed the Landowners on a "front footage" basis, the Landowners ". . . would have had no basis for complaint". This statement in the memorandum was unnecessary, and at worst was superfluous to the decision. The determinative factors in this case are whether the charges in the project, the computation of tax bills and the relation of these assessments to other projects, showed the City's action in determining special benefits was arbitrary. Even with the City improving drainage, providing curbs and sidewalks and the relieving the Landowners of future maintenance charges, the court could absolutely find from the facts no net benefit to the Landowners.

H. The City again disputes the finding of showing of special benefit to single family Landowners. The trial court, noting that full development of this residential property would take sixteen to nineteen years, found no benefit. Any enhancement to the land from this project would be too remote in time to now consider as a benefit. *Page v. City of Lockhart, supra.* A widened street, sidewalks and the presumption of benefits from the legislative act, are rebutted by the evidence in this case.

I. The City casts as "totally untrue" the trial court's finding that the length of the project was changed to a shorter distance in a later series of council activities. On February 21, 1972 in Council Bill 59–72 the project was to go from the Vandiver Drive intersection on the south, north to the city limits. The total estimated cost was $345,200 at $13.70 a foot. On February 19, 1973 by Ordinance 5969 the south boundary of

the project was to be at Holly Avenue rather than Vandiver. Holly is approximately 825 feet farther north of Vandiver. The northern boundary was changed to "20 feet north of Grace Ellen Drive." The intersection of Grace Ellen and Oakland Gravel is to the south of the City line. A public hearing on the 1972 action was held on March 20, 1972. No provision for hearing was contained in the 1973 action which contained a front foot cost of $13.70. The only hearing in 1973 was on the letting of the construction bid. On April 7, 1975 the Council passed a Resolution (128–75) to raise costs on this project to $18.60 per foot for the project as described in 1972 (Vandiver north to city limits). A public hearing on this rise in *costs* was held on April 28, 1975. Then on June 2, 1975 Ordinance 6696 was passed for $18.60 in costs and awarded the construction contract for ". . . construction on Oakland Gravel Road, from Vandiver Drive (Holly Avenue) to 20 feet north of Grace Ellen Drive, north leg, . . . ." Despite the City now saying the project description was "exactly the same", the evidence directly contradicts this assertion. The project was changed from earlier versions in Ordinance 6696 (June 2, 1975) and on April 28, in Ordinance 6651 to proceed with construction from Holly to 20 feet north of Grace Ellen. This was done without benefit of public hearing in contravention of Section 75 of Article IX of the City Charter.[10]

J. The City seems to repeat its complaint mentioned in (I) above by contending there were no changes in the plans and specifications of the project. This argument is without merit for the reasons previously given.

K. The final tax bills for this project ranged from $10.93 a front foot to $18.23. The City presented no explanation for these wide variations in a project less than a mile in length. In fact, the city manager and a Councilman who testified said the figures came from public works (see F above). No specific evidence by Public Works as to charges on specific properties was adduced. There was no rhyme or reason for the variations, nor in the totals themselves for such an expensive project with such expensive consequences for individual Landowners. The only interest of the council members in charges is shown in the following statement in the minutes of the council meeting just prior to the levy of the tax bills:

"Councilman Hanson asked if this provides for relief on corner lots and Mrs. Thomas stated it provides the relief on corner lots where the property owners did not appeal and if an appeal was filed they got that relief recommended by the Special Assessment Board of Appeals and accepted by the City Council."

L. The trial court listed other projects, including that portion of Oakland Gravel completed in another project (south of Holly to Vandiver, of approximately 825 feet) which had lower bills to landowners. Those projects were contemporaneous with this one and in locations proximate to Oakland Gravel. The costs to citizens in the other projects were substantially lower than here. One of the projects was for Fay Street, was a 32 foot reconstruction. The City of Columbia states this project is outside the project area and irrelevant to this project. This point is not preserved and is not well-taken. Lawyers for both sides questioned an engineer-witness on the Fay Street project. The City cannot now say that Fay's charges are irrelevant. The City's argument that this decision goes against *Ashley v. Metz,* 513 S.W.2d 308 (Mo.1974), is not well taken. The court in *Ashley* spoke in terms of no cause of action accruing to

10. Section 75. *Public Hearings.*
Upon the adoption of such resolution, the Council shall provide for and give adequate notice of a public hearing in respect to all improvements to be paid for by special assessments and all other public improvements the total estimated cost of which shall be seven thousand five hundred dollars or more. Such public hearing shall be held not less than ten nor more than thirty days after the adoption of such resolution, and all persons interested in such improvement shall be given an opportunity to be heard. After such hearing, the Council may determine that it is or is not in the public interest that such improvement or any part thereof be made.

review benefits where all classes of taxpayers were treated the same and taxed at the same rate; such was not the case here. *Id.* at 310.

M. The Landowners' evidence on several other projects was objected to by the City on grounds of relevancy. Those objections were overruled. Now, the City without stating why the rulings were improper, or why the evidence of costs of other projects is prejudicial here, claims error in the court's rulings, particularly with regard to the project mentioned earlier that included the southern 825 feet of Oakland Gravel. The trial court has wide discretion on the admission of evidence. Its overruling the City's objection to admission of the tax bill information on the Vandiver Road project was correct, and not an abuse of discretion. The Council in March of 1973 passed a resolution on the Vandiver project with costs to the landowners not to exceed $13.75. On July 7, 1975 the Council reiterated the $13.75 amount when the contract was rebid. The evidence showed the Vandiver project was completed around the same time as the Oakland Road project (the engineer's report for Vandiver was on November 30, 1976, with tax bills for $13.74 and $13.75 a foot approved by Ordinance 7291 on December 20, 1976). The City here contends the reason for the cost increase is the charge it paid for asphalt. That price rise occurred in 1974 and would have affected both projects. It is relevant to the disposition of this case as the costs for the northern portion of Oakland Gravel went as high as $18.23 (this project) when the southern portion stayed at $13.75.

N. Columbia disputes the relevancy and accuracy of another of the court's findings on still another project involving a part of Vandiver Drive. This project, for the sake of simplicity called Vandiver West was completed just prior to the project in question, had tax bills from $2.48 to $13.70 with some owners getting no assessment.

O. The City disputes the finding that no public hearing was held nor resolution adopted following the passage of Ordinance 6651 on April 28, 1975 after which construction was then commenced. The City in essence argues that a resolution declaring the necessity of the original project (Council Bill 59–72, February 21, 1972) and the hearing held thereon on March 20, 1972 covering the whole project to the City line, sufficed for the action in 1973 (Ordinance 5969, February 2, 1973) and carried through to the April 1975 action that rebid the shorter project. Not only is this argument not sound on its face, but taken in conjunction with the Council resolutions in 1975 scrapping the earlier resolutions and particularly releasing the contractor from the contract of April 10, 1973 (Ordinance 6615, March 10, 1975) it makes the city's position even more untenable. The only finding of necessity on the project was in February of 1972 concerning the longer original project. The project was later changed with no finding of necessity and no hearing. The 1975 action made no showing on the revised scope of the area. The only hearing after 1972 was for increased costs held on April 29, 1975, prior to the City rebidding the project.

P. The court's finding that 90% of the use of Oakland Road was for the general benefit is next faulted by the City. The City says the judge can make no such judgment when the City has made its legislative determination of special benefits. This argument, as mentioned elsewhere, is not correct, for to hold as the City's request would mean no court could ever question an action by a legislative body relative to special benefits and no legislative act could ever be found to be arbitrary or capricious.

Q. The trial court noted the unique character of this area and its large lots. The "improvements" put in by the City would encourage "assembly line" housing. This matter was prompted by an expert witness for the City who said the larger tracts could then be sub-divided thus conferring a benefit upon the Landowners and the property. This is ruled against the City.

R. It is unfortunate the only levity in this case is contained in the most serious allegation leveled by City against the trial judge—that as further evidence of his

abuse of discretion he kept the case "under advisement for three years, particularly after temporarily enjoying (sic) the defendant ..." The City notes it also had to get three extensions of time to have the transcript prepared. The City concedes in its 100 page brief that the volume of the record might have something to do with the amount of time the case was under advisement. The City cites an authority Rule 2 Canon 3 A.5 which says judges should promptly dispose the business of the court.

Although the time under advisement does seem inordinate that does not undo nor detract from the detailed Memorandum Decision and Judgment prepared by Judge Conley which this court feels was complete and in accordance with case law involving special assessments.

None of the allegations in this point on cumulative error amount to error. This point is ruled against the City.

## VI.

The City contends the Landowners are barred by *res judicata,* estoppel and waiver from now discussing the suffering of a detriment because they voluntarily conveyed the rights-of-way to the City.

First the Landowners were offered $1 for their property to be taken. When that didn't work Attorney David Knight was hired by the City to file suits for condemnation. He filed them between June 5 and June 20, 1973. The suits were voluntarily withdrawn by the City in October 1973 while the courts were considering whether the City offers were in good faith.

Knight then had the parcels appraised without consideration of the "special tax bills" and he told the appraiser not to "mention anything about special benefits, because I thought we could have a clean trial." In other words, the appraiser was told to not consider special benefits but determine the actual square foot value of the ground taken—that was done and all but one parcel was thereby acquired. All condemnation was concluded without going to trial.

The parties stipulated that all Landowners had "condemnation cases prosecuted to final determination or have given voluntary conveyances ...." Apparently some had settled for nominal consideration and some accepted the amount offered after the City's appraisal. The Landowners also (from July to September, 1974) attempted, unsuccessfully, to block the condemnation by a writ of prohibition in this court and the Supreme Court. The City says *res judicata* applies as the Landowners waived any right to any "future damages" when they relinquished their property.

The cases cited by the City that do not allow a person to ask for additional damages after a taking of their land do not apply here. The City would have the Landowners consolidating the taking and the issue of special benefits, to be tried at once, and if the Landowners didn't counterclaim in the condemnation suit they could never again raise the assessment issue when the tax bills came out. This stance on appeal is contrary to the City's evidence. Knight instructed the appraiser to look only at the square foot value of the property so as not to cloud the issue with that of the special assessment. The whole idea of the doctrine of *res judicata* is to avoid a multiplicity of suits nagging at a party—here that is exactly what the party to be protected under the doctrine, the City, wanted: a splitting of the condemnation and the special benefits. The City's argument now that detriments from construction should have been litigated at the time of condemning the land further eroded by the testimony of Landowner Harry Brown before the ill-fated Special Assessment Board in August 1975. In the Minutes of this meeting, introduced in evidence, Brown said he and the other Landowners had given easements, without restrictions three years prior but with the understanding that it "... did not mean that we did not object to the method of tax billing for that kind of road." Brown told the Board his tax bill for this project equaled some 18 years worth of taxes paid on the property. His bill for this project was approved by the Board at

$7000, for his over 400 foot lot abutting Oakland Gravel Road.

The City's argument on *res judicata* has another fallacy under *Grue v. Hensley,* 357 Mo. 592, 210 S.W.2d 7, 10 (1948). *See also Stoops v. Stoops,* 363 Mo. 1075, 256 S.W.2d 799, 801 (1953). In *Grue* one of the tests for determining whether a cause of action is single and cannot be split is "... whether the parties, subject matter and evidence necessary to sustain the claim are the same in both actions." *Id.* 210 S.W.2d at 10. Under that doctrine the issues and evidence here are not the same as in condemnation suits. The special assessment issue had not come up nor were the tax bills due at the time of the condemnation. *Cf. Grue, supra* 210 S.W.2d at 11. To apply doctrine of *res judicata* now would be unfair and inappropriate.

There being no judgment on benefits to the Landowners, *res judicata* is not here applied. The other failure in the City's argument is that Landowners are not seeking additional damages in this suit. This is conceded by City in its brief when it says the Landowners are alleging damages but "not in a form that could result in monetary recovery." This suit is not a collateral attack on condemnation judgments as the City contends. The Landowners are merely denying any special benefits for which they may be tax billed. The remedy they seek is to set aside tax bills. The matter of special benefits was at most speculative at the time of condemnation. In *Tremayne v. City of St. Louis,* 320 Mo. 120, 6 S.W.2d 935 (1928) the Landowners were suing in tort for damages done by the City in grading. In *Tremayne* the City began work on the street *prior* to final judgments in condemnation. Here construction began after the property was acquired. There was no way special benefits, or lack thereof, could have been litigated at the time of condemnation proceedings in 1973. The Landowners' other contentions as to the method of apportionment and rates being inconsistent and arbitrary could not have been anticipated or litigated at the time the City acquired the property. The Special Assessment Board was not even created until 1975 the same year the front foot assessments were raised. There was neither claim nor issue preclusion resulting from the City's acquisition of property in 1973.

Again, the Landowners are not seeking damages—there is here no collateral attack on the condemnation. The only issue here, not estopped, waived or previously adjudicated is, whether a special benefit was conferred up on the Landowners for which they may now be charged. The answer to that is "No".

The action of the City was not fairly debatable—it was unreasonable and arbitrary.

The judgment is affirmed.

All concur.